Reversed and remanded.[2]  The cross-appeal is dismissed.

606 A.2d 401

IN THE MATTER OF A PRIVATE PASSENGER AUTOMOBILE RATE REVISION ON BEHALF OF THE AETNA CASUALTY AND SURETY COMPANY.

Superior Court of New Jersey
Appellate Division

Argued March 2, 1992—Decided April 28, 1992.

---

[2]Four additional states have made changes to their Codes to permit the use of variable interest rates without affecting negotiability: Florida, Illinois, Montana and Nebraska. These changes were made in late 1991 or in 1992, and we were unable to obtain pinpoint citations prior to filing this opinion.

Before Judges R.S. COHEN, A.M. STEIN and KESTIN, (temporarily assigned).

*Mark F. Horning,* admitted *pro hac vice,* argued the cause for appellant (*Hannoch Weisman,* attorneys; *Mark F. Horning,* of counsel and on the brief; *Susan Stryker* on the brief).

*Patricia A. Kern,* Deputy Attorney General, argued the cause for respondent Department of Insurance (*Edward J. Dauber,* Acting Attorney General, attorney; *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Patricia A. Kern* on the brief).

*Theresa D. Brown,* Assistant Deputy Public Advocate, argued the cause for intervenor Department of the Public Advocate, Division of Rate Counsel (*Wilfredo Caraballo,* attorney; *Theresa D. Brown* on the brief).

The opinion of the court was delivered by

ARNOLD M. STEIN, J.A.D.

Aetna Casualty & Surety Company and its affiliate companies, the Standard Fire Insurance Company and the Automobile Insurance Company of Hartford, Connecticut, appeal the order of the Commissioner of Insurance denying its application for increase in private passenger automobile premium rates.

The application has a troubled history. *See Allstate Ins. Co. v. Fortunato,* 248 *N.J.Super.* 153, 158–59, 590 *A.2d* 690 (App.

Div.1991).[1]  It was filed on June 29, 1990.  The application then went back and forth between Aetna and the Department of Insurance, with the Department maintaining the position that the carrier's application was incomplete.  *Id.* at 158, 590 *A.*2d 690.  Allstate and Aetna then brought separate actions in the Chancery Division seeking to compel the Commissioner to accept their rate increase applications for filing.  Judge Levy ordered the Commissioner to submit Allstate's and Aetna's filings to the Office of Administrative Law for contested case hearings.  We affirmed in our opinion of May 14, 1991.  *Id.* at 166, 590 *A.*2d 690.

The hearings began before the Administrative Law Judge on May 28 and were completed on June 10, 1991.  The ALJ rendered his initial decision on September 15, 1991.  He concluded that Aetna was not entitled to a rate increase but gave the carrier the option of submitting revised rate schedules consistent with his findings.  The Commissioner affirmed, for somewhat different reasons than those set forth by the ALJ.

■  We accept the Commissioner's findings: as to the application of symbol drift in measuring premium trends; his method of calculating loss development factors for uninsured/underinsured (UM/UIM) motorist claims; and the application of twelve point historical data in calculating loss trends.  These conclusions are amply supported by substantial credible evidence in the record below and should not be disturbed.  *Clowes v. Terminix Intern., Inc.,* 109 *N.J.* 575, 587, 538 *A.*2d 794 (1988); *In re N.J. Medical Malpractice,* 246 *N.J.Super.* 109, 134, 586 *A.*2d 1317 (App.Div.1991).

■  We reverse the Commissioner's ruling applying the methodology providing a higher yield rate on invested policy-

---

[1]Allstate Insurance Company, the named plaintiff, also was initially unsuccessful in having the Commissioner accept its rate increase application for filing.  *Allstate Ins. Co. v. Fortunato, supra,* 248 *N.J.Super.* at 157–58, 590 *A.*2d 690.

holder funds in effect at the time of Aetna's filing rather than that in effect at the time of the hearings. We agree with the ALJ's conclusion that the new regulatory amendment (simple average of most recent 12 monthly numbers for Treasury constant three-year maturity rate) more accurately reflects actual yield rate than the previous calculation method (based on statutory interest rates used by the Internal Revenue Service). *See N.J.A.C.* 11:3–16.10(a)(8) effective November 26, 1990. The disposition of this application was considerably delayed. It would be unrealistic and unfair to use an interest yield rate formula which the Department of Insurance recognized as obsolete well before these hearings began. We must assume that the most recent amendment to the regulation reflects a more current and accurate yield rate than that which it replaced. The current method of calculating the yield on premiums should be used. Its adoption preceded the ALJ hearings and its use would not prejudice the factual presentation of the parties.

■ The centerpiece of Aetna's appeal is the refusal by the ALJ and the Commissioner to consider as ratemaking factors the cost claimed to be associated with depopulation into the voluntary insurance market of drivers formerly insured by the Market Transition Facility (MTF), and that share of projected MTF losses predictably chargeable against Aetna. The argument was hastily conceived just before the ALJ hearings began. Aetna's original application filed back on June 29, 1990, did not and could not include an allowance for anticipated MTF deficits. The MTF did not begin to issue policies until October 1990, after Aetna had already filed. *N.J.S.A.* 17:33B–11c.

The contested hearings on the application finally commenced on May 28, 1991. Anxious to conclude this already aged application proceeding, Aetna did not amend its filing. Instead, for the first time, shortly before the commencement of hearings, the carrier sought to introduce evidence that its projected costs resulting from depopulation required an additional rate

increase of + 21.2%, and that an additional + 24.3% increase was needed to offset Aetna's estimated $8 million share of the operating shortfall incurred by the MTF during its first year of operation. This proof was first made available to the ALJ and opposing counsel in the form of a transcript of the prefiled testimony of Aetna's actuarial expert.

The ALJ excluded these proposed proofs because their presentation would have improperly injected new and complex issues on the eve of trial. The Commissioner upheld this exclusion.

We agree that the ALJ correctly excluded this depopulation cost and shortfall evidence first offered by Aetna just before trial. This case could not have proceeded without giving opposing counsel for the Department of Insurance and the Public Advocate an opportunity to review this newly-proposed evidence and arrange for its evaluation and probable testimony by their own experts. This would have required adjournment of the proceeding, probably for a considerable period of time, further frustrating efforts to bring this application proceeding to conclusion.

The Fair Automobile Insurance Reform Act of 1990 (FAIR Act), *N.J.S.A.* 17:33B–1 *et seq.*, established the MTF to provide for the orderly transfer of drivers from the Joint Underwriting Association (JUA) into the voluntary market:

MTF was to gradually take on the risks whose JUA policies expired after September 30, 1990, and was to issue its own policies for two years, until October 1, 1992. During that time, the MTF population would be reduced, if necessary by periodic assignments of risks to insurers who did not voluntarily take on their share, to 32%, 29%, 20% and, finally 10% of the market. The 10% residuum of rejected risks would be relegated to the old assigned risk plan. *N.J.S.A.* 17:33B–11e(5); 17:29D–1. [*Matter of Market Transition Facility*, 252 *N.J.Super.* 260, 265–66, 599 *A.*2d 906 (App.Div.1991), *certif. denied*, 127 *N.J.* 565, 606 *A.*2d 376 (1992)].

We conclude that the Commissioner did not abuse his discretion by upholding the ALJ's refusal to allow proofs as to alleged costs associated with depopulation assignments from the MTF. The FAIR Act permits a carrier to charge a presum-

ably higher MTF rate rather than its own voluntary market rates to drivers insured pursuant to the depopulation provisions of the FAIR Act. The MTF rates may be continued for a three-year period including the time the insured was covered by the MTF. *N.J.S.A.* 17:33B–12. Aetna claims that because MTF rates are inadequate, it will lose money on each depopulated driver that it is required to insure. That may not be so. Aetna may be able to carry these depopulated insureds at lower operating cost than the MTF. Additionally, since this filing, the Commissioner has already granted rate increases to MTF. Moreover, unlike some other carriers, Aetna has refused to take on any depopulation insureds. By its own choice, Aetna has no loss experience with these depopulated drivers. It cannot complain about the Commissioner's failure to consider such speculative "evidence" about the potential effect of MTF rate inadequacies.

■ We view differently the Commissioner's refusal to permit proofs of MTF's operating loss deficit as a basis for a rate increase.

Ordinarily, we would not question the final decision of the Commissioner in upholding the exclusion of this evidence, a correct ruling at the time it was made by the ALJ. The Commissioner's decision requires closer inspection because of his unique status in this proceeding. The brief submitted on his behalf states:

> If the issue were now presented to him, the Commissioner would still be correct to conclude that prediction of the ultimate financial outcome of the MTF, consequent assessments and the costs of depopulation remains a speculative venture. The estimate of a current deficit does not determine the ultimate financial outcome of the MTF.
>
> . . . .
>
> Although MTF losses are somewhat less speculative now than when the issue was presented to the Administrative Law Judge, the fact remains that these losses will be incurred in the future rather than immediately. The insurers have not been asked to pay a dime. There is no basis to presently require insureds to pay increased rates now based on the MTF losses.

In addition to his obligation as a department head to reach a final decision after *de novo* review of the record before the ALJ, *N.J.S.A.* 52:14B–10(c)(d), the Commissioner is the regulatory supervisor of the insurance industry in New Jersey, *N.J.S.A.* 17:1C–3, specifically charged with operation of the Market Transition Facility. *N.J.S.A.* 17:33B–11. In that capacity he had access to every bit of information that the MTF had about its operation and the deficit it was generating.

In *Matter of Market Transition Facility, supra,* 252 *N.J.Super.* at 263–65, 599 *A.*2d 906, we concluded that the Commissioner has a statutory duty to attempt to operate the MTF on a no-profit, no-loss basis. When we rendered our decision in that case on November 19, 1991, indeed, by the time the Aetna application reached him for final decision in late September or early October, the Commissioner undoubtedly knew that the MTF would not fulfill that break-even goal. We now know that the MTF will surely go out of business on September 30, 1993, (*N.J.S.A.* 17:33B–11c(5)) with a large deficit, allocated among the carriers writing automobile insurance in New Jersey:

> The commissioner shall apportion any profits or losses of the facility among member companies based on each company's apportionment share as determined for purposes of depopulation pursuant to subsection a. of section 26 of P.L.1983, c. 65 (C. 17:30E–14). [*N.J.S.A.* 17:33B–11d].

In November 1990, almost one year before this case reached the Commissioner for final decision, he had already received two actuarial reports that predicted a huge MTF operating shortfall resulting from drastically inadequate rates. In January 1991 his own special deputy urged him to fix higher MTF rates. *Matter of Market Transition Facility, supra,* 252 *N.J.Super.* at 267–68, 599 *A.*2d 906. By January 1992 the Commissioner estimated the MTF first-year loss at $375 million. It is inconceivable that in October 1991 he was unaware of the hundreds of millions of dollars of MTF losses which had already been incurred.

In these circumstances, we find it disingenuous for the Commissioner to deny Aetna's rate filing for MTF shortfall relief on

the grounds that this carrier had not yet proven to him that his own facility was producing large deficits. The Commissioner cannot ignore facts which he keeps to himself and make decisions because an applicant has failed to prove them.

The situation, then, had changed considerably from the time of Aetna's original filing. Aetna understandably sought to include what it perceived as a significant factor in evaluating its rate increase needs: a reserve for its statutory share of the losses incurred by the MTF for at least the first year of its operation.

The fixing by Aetna of some reserve to cushion against the inevitable receipt of a bill for its share of MTF losses is a matter of calculation, not of speculation. We cannot conceive that Aetna's projected share of the MTF's first-year $375 million loss cannot be quantified. It is at least as calculable as the reserve historically set aside by insurance carriers in anticipation of payment of property damage and personal injury claims. *See, e.g., N.J.A.C.* 11:3–16.10(a)5 and 6.

*N.J.S.A.* 17:33B–11d does not provide a method for payment of these MTF losses by the auto insurance companies. To date, the Commissioner has not announced how he intends to permit the insurers to deal with the expense. We assume that he will use some method whereby the MTF loss share assessed to each carrier will be defrayed in such a way as to avoid impairing the carrier's right to a fair rate of return. *U.S. Const.* amends. V, XIV; *N.J. Const. of 1947* art. 1, para 1. *State Farm v. State,* 124 *N.J.* 32, 48–52, 590 *A.*2d 191 (1991).

The Commissioner of Insurance refuses to require present policyholders to pay for Aetna's share of any projected losses arising from operation of the MTF. Eventually, each carrier will receive a bill for its share of these losses. The Commissioner should provide for a reasonable method and time to permit the carriers to pay these bills.

If an insurance company is entitled to a reasonable opportunity to make a fair return on its investment, it is certainly

entitled to pursue that goal free from unreasonable governmental billing practices, not just the threat of insolvency. The Commissioner of Insurance regulates insurance companies in New Jersey. He does not operate them. He should not reject prudent business practices of insurance carriers consistent with the statutory regulatory scheme.

Nevertheless, on the record before us, we are obliged to yield to the Commissioner's determination that Aetna's establishment of a reserve for payment of its share of anticipated MTF losses is premature. The Commissioner has not yet presented the MTF loss bills to the insurance companies. He says that he does not expect to send the bills out until sometime in 1993.[2] *Matter of Market Transition Facility, supra,* 252 *N.J.Super.* at 274 n. 5, 599 *A.*2d 906. In the meantime, he refuses to permit Aetna to charge present policyholders for this unique projected loss. He declines to implement what Aetna insists are reasonable business methods of setting aside money for a predictable calculable cost. We cannot tell the Commissioner how to run the Department of Insurance. So long as he does not deprive Aetna of its right to a reasonable rate of return, *Sheeran v. Nationwide Mutual Insurance Company, Inc.,* 80

---

[2]It is arguable that the Commissioner is ready to send a partial bill for a portion of the MTF's operating losses to some of the automobile insurance carriers. In his order of March 24, 1992, denying a rate increase to MTF, the Commissioner announced that he intends to fund much of the MTF's losses by imposing a $180 per exposure assessment on auto insurance companies which he says did not meet depopulation quotas. He proposes to do this by amending the MTF's plan of operation. Section 7C of the plan, as amended, provides that "Member companies may not include this [$180] Transition Assessment in any rate filing."

We invited the parties to submit letter briefs on the effect of this order and the proposed amendment to the plan of operation. Aetna says that the assessment is illegal, an improper attempt by the Commissioner to pass on operating losses to some carriers without any prospect of recovery.

The argument is premature. The assessment has not yet been levied. It is still in the form of a proposed amendment to the MTF's plan of operation. Moreover, this contention is suitably tested in a separate appeal addressing all of the reasons for challenging this assessment if it becomes effective.

*N.J.* 548, 560, 404 *A.*2d 625 (1979), we will not interfere with that decision.

In spite of our concerns and notwithstanding the Commissioner's transmission of numerous contrary signals, "We will ... presume that the Commissioner will fulfill his duty under the statute to assure that insurers receive a constitutional rate of return ... in a realistic and timely manner consistent with the statutory duty." *State Farm v. State, supra,* 124 *N.J.* at 62–63, 590 *A.*2d 191.

Affirmed in part, reversed in part. Remanded to the Commissioner of Insurance for recalculation of investment yield income based on current regulations.

KESTIN, J.S.C. (Temporarily Assigned), concurring in part and dissenting in part.

I concur in all aspects of the court's decision except the deference accorded the Commissioner's decision disallowing Aetna the opportunity to establish a reserve, funded through its rates, to meet its statutory obligation to share in the losses incurred by the MTF. The Commissioner's stated rationale for denying this relief is that the establishment of a reserve is premature because no MTF loss bill has yet been sent to Aetna. This position makes no sense to me.

Establishment of a reserve to meet an anticipated loss is, by definition, premature; but that quality negates neither the prudence of such a step nor its necessity. It is common practice among well-run businesses to establish reserves to meet anticipated losses. Failure to do so might well be considered to be evidence of mismanagement.

I agree that the Commissioner of Insurance is authorized to regulate insurance companies, not to operate them. I would take the next step in the reasoning process and hold that, absent a clear source of authority in a specific statutory provision or in a regulation adopted in fair pursuit of a power

conferred by statute, the Commissioner may not forbid the use of a prudent business practice.

We are obliged to defer to a proper discretionary determination by the head of a State agency. *See Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313, 327, 478 *A*.2d 742 (1984). But, in the absence of a statute-based policy determination supported by substantial evidence in the record, the Commissioner's decision to deny Aetna the right to pursue a prudent business practice is arbitrary and, therefore, does not call for deference.

Although the extent of the ultimate MTF deficit has not yet been quantified, the Commissioner acknowledges that it will be substantial. Aetna's future responsibility for a share of that loss is not merely anticipatory, it is inevitable. *See N.J.S.A.* 17:33B–11d.

There is no good in arguing with the inevitable. The only argument available with an east wind is to put on your overcoat. And in this case, also, the prudent will prepare themselves to encounter what they cannot prevent.

James Russell Lowell, *Democracy*, in 7 LITERARY AND PO-LITICAL ADDRESSES 1, 14 (Houghton Mifflin Co., Boston 1975) (1886).

We should reverse the Commissioner's decision to deny Aetna the opportunity to insulate itself against future loss by means commonly used in commerce and industry. I would broaden the scope of our remand to require the Commissioner, with such reasonable safeguards as he deems appropriate, to include this factor in determining Aetna's automobile premium rates.