752 A.2d 356 (2000)
331 N.J. Super. 458
R.J. GAYDOS INSURANCE AGENCY, INC., t/a Schumacher Associates, Plaintiff-Appellant,
v.
NATIONAL CONSUMER INSURANCE COMPANY, The Robert Plan Corporation, The Robert Plan of New Jersey, Lion Insurance Company, Defendants-Respondents, and
John Does 1-200, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 2000.
Decided June 12, 2000.
*357 Richard A. Grodeck for plaintiff-appellant (Feldman Grodeck, attorneys; Mr. Grodeck, on the brief).
Alan E. Kraus, Morristown, for defendant-respondent (Riker, Danzig, Scherer, Hyland & Peretti, attorneys; Mr. Kraus, of counsel; Robert J. Schoenberg and R.N. Tendai Richards, on the brief).
Before Judges BAIME, BROCHIN and WECKER.
The opinion of the court was delivered by BAIME, P.J.A.D.
The Fair Automobile Insurance Reform Act (N.J.S.A. 17:33B-1 to -64) (FAIRA) requires insurers to accept applications for automobile insurance submitted by all eligible persons, that is, those not falling within a statutorily defined poor risk category. N.J.S.A. 17:33B-15. The Act bars insurers from penalizing an agent by paying less than normal compensation because of the expected or actual loss experience produced by the agent's automobile insurance business or because of the geographic location of the business written by the agent. N.J.S.A. 17:33B-18b. At issue is whether these provisions preclude an insurer from terminating an agency relationship based upon the agent's volume of high loss ratio policies generated in an urban market.
R.J. Gaydos Insurance Agency, Inc. (Gaydos) brought this action in the Chancery Division contending that National Consumer Insurance Company (NCIC) breached an express contract and its implied covenant of good faith and fair dealing by wrongfully terminating its agency agreement. Gaydos contended that NCIC's termination of its agency relationship was based upon its generation of high loss ratio policies in an urban market and that the termination violated the "take all comers" requirement of FAIRA. Also named as defendants were the Robert Plan Corporation, a holding company and the ultimate parent of NCIC, the Robert Plan of New Jersey, its subsidiary, and Lion Insurance Company, NCIC's predecessor. Gaydos claimed that the Robert Plan defendants tortiously interfered with its contractual rights with NCIC. The Chancery Division granted defendants' motion for involuntary dismissal at the conclusion of Gaydos's case. Gaydos appealed. We remanded the matter *358 for additional findings of fact. The Chancery Division found that NCIC's termination of Gaydos was designed to reduce the volume of its business losses in order to preserve its solvency and that neither Gaydos's actual or expected loss experience nor the geographic area in which it underwrote its business constituted a substantial motivating factor in the termination of its agency relationship. We now reverse and remand for further proceedings.

I.
The setting is the perennially troubled New Jersey automobile insurance market. In a long line of decisions, we have described at length the problems besetting the automobile insurance industry. In re Producers Assignment Program, 261 N.J.Super. 292, 618 A.2d 894 (App.Div. 1993), certif. denied, 133 N.J. 438-39, 627 A.2d 1144 (1993); In re Aetna Cas. and Surety Co., 248 N.J.Super. 367, 591 A.2d 631 (App.Div.), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991), cert. denied, 502 U.S. 1121, 112 S.Ct. 1244, 117 L.Ed.2d 476 (1992). See also In re Plan for Orderly Withdrawal, 129 N.J. 389, 609 A.2d 1248 (1992), cert. denied, 506 U.S. 1086, 113 S.Ct. 1066, 122 L.Ed.2d 370 (1993); State Farm v. State, 124 N.J. 32, 590 A.2d 191 (1991); Inre Comm'r of Insurance, 256 N.J.Super. 158, 606 A.2d 851 (App.Div. 1992), aff'd 132 N.J. 209, 624 A.2d 565 (1993); In re Private Passenger Auto. Rate Rev., 256 N.J.Super. 46, 606 A.2d 401 (App.Div.1992); In re Rate Filing By Market Transition Facility of New Jersey, 252 N.J.Super. 260, 599 A.2d 906 (App.Div. 1991), certif. denied, 127 N.J. 565, 606 A.2d 376 (1992); Allstate Ins. Co. v. Fortunato, 248 N.J.Super. 153, 590 A.2d 690 (App.Div. 1991). We need not cover ground so exhaustively explored in the cited cases. Instead, we recount the legislative, highlights only insofar as they shed light on the issues before us.
We begin with the adoption of the assigned risk plan in 1970. That plan involved the forced distribution among insurers of applicants who were unable to procure coverage through ordinary means. N.J.S.A. 17:29D-1. Effective in 1973 was the New Jersey Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 to -35), which made automobile insurance compulsory, created extensive no-fault benefits, and imposed a tort threshold.
In 1983, the Legislature adopted the New Jersey Automobile Full Insurance Availability Act (N.J.S.A. 17:30E-1 to -24). The Act's articulated objectives were to supplant the assigned risk system, "to assure to the New Jersey insurance consumer full access to automobile insurance through normal market outlets ..., and to require that companies be made whole for losses in excess of regulated rates on all risks not voluntarily written...." N.J.S.A. 17:30E-2. Unlike the assigned risk system, the new legislation contemplated coverage provided by JUA, at standard market rates, to risks rejected by the voluntary market. Servicing insurers were to issue policies in their own names, but the risks were to be borne by JUA. The servicing insurers would be paid fees for handling coverage, premiums and claims. JUA's inevitable underwriting losses would be funded by poor driver and accident surcharges imposed by the Division of Motor Vehicles and JUA, and the "residual market" equalization charge levied on almost all automobiles. N.J.S.A. 17:30E-8b.
The new scheme failed miserably. Insurers restricted their coverage to only the most favorable risks, leaving fully half of New Jersey's drivers to be covered through JUA at artificially low rates. JUA's financial integrity deteriorated rapidly, resulting in increasingly large charges imposed on all New Jersey drivers.
Curative amendments were adopted in 1988. We need not describe these changes in detail. Perhaps the most important aspect of the 1988 legislation was a plan for the downsizing, or depopulation, of JUA over a four year period to the end that it *359 would serve only its original purpose of providing coverage for the least desirable risks. N.J.S.A. 17:30E-14. In annual increments, the voluntary market insurers were to increase the percentage of private passenger car exposures. Methods were prescribed for apportioning and assigning to voluntary market insurers the number of JUA insureds sufficient to satisfy any shortfall that occurred in the required annual increase in voluntarily written policies.
FAIRA was enacted on March 12, 1992. Its overall purpose is to ensure that all automobile owners in New Jersey, except those who meet statutorily defined objective criteria of poor risk, see N.J.S.A. 17:33B-13, are covered by the voluntary market. FAIRA created the Market Transition Facility as an interim mechanism to achieve a two-year, phased depopulation of JUA, and the transfer of JUA insureds to the voluntary market. N.J.S.A. 17:33B-11.
In order to assure that all eligible insureds have a viable conduit to the voluntary market, FAIRA established a producer assignment program. N.J.S.A. 17:33B-9. We have no occasion here to describe the intricacies of the program, which are examined in detail in In re Producer Assignment Program, 261 N.J.Super. at 298, 618 A.2d 894. The heart of the legislation is paragraph 6, which requires the Commissioner to establish a producer assignment program by October 1, 1991, that is, one full year prior to the final depopulation of the Market Transition Facility and the mandated assumption by the voluntary market of the obligation to insure all eligible persons. Ibid. We note that one of the criteria for producer assignment eligibility is that the producer must be located in and service a geographic area determined by the Commissioner "to lack sufficient representation for the placement of automobile insurance business in the voluntary market." N.J.S.A. 17:33B-9. We make special reference to this section because it evidences the Legislature's concern that agents be available to serve as conduits to the voluntary market for eligible persons in areas that have been historically underrepresented because of poor loss experience. In any event, the manner in which JUA insureds were depopulated and distributed to insurers in the voluntary market is described in In re Aetna Cas. and Sur. Co., 248 N.J.Super. at 375-76, 591 A.2d 631, and, as we will note shortly, provides the factual backdrop for the formation of NCIC.
FAIRA established the rule of "take all comers," which requires insurers to accept applications for automobile insurance submitted by all eligible personsthose not falling within the poor-risk category, N.J.S.A. 17:33B-15, and revived the pre-JUA system of an assigned risk plan to provide coverage for all ineligible persons. N.J.S.A. 17:33B-22. The "take all comers" section provides that "every insurer, either by one or more separate rating plans filed in accordance with [N.J.S.A. 17:29A-45] ... shall provide automobile insurance coverage for eligible persons." N.J.S.A. 17:33B-15a. N.J.S.A. 17:33B-15b states that "[n]o insurer shall refuse to insure, refuse to renew, or limit coverage available for automobile insurance to an eligible person who meets its underwriting rules as filed with and approved by the [C]ommissioner [of Insurance]." These provisions are supplemented by N.J.S.A. 17:33B-18(b) which bars an insurer from "penaliz[ing] an agent by paying less than normal commissions or normal compensation or salary because of the expected or actual experience produced by the agent's automobile insurance business or because of the geographic location of automobile insurance business written by the agent." The "take all comers" rule has been described as the "centerpiece of the FAIRA scheme" because it makes available to eligible insureds the voluntary market which would otherwise be "inaccessible for an obvious panoply of demographic reasons." In re Producer *360 Assignment Program, 261 N.J.Super. at 299, 618 A.2d 894.
The Legislature was undoubtedly aware that the "take all comers" sections could financially imperil insurers by requiring them to assume higher risks through the generation of high loss ratio policies. FAIRA thus provides for the suspension of an insurer's obligation to insure eligible persons if the insurer is "in an unsafe or unsound financial condition." N.J.S.A. 17:33B-19. FAIRA also empowers the Commissioner to suspend an insurer's assigned risk and assessment obligations on the same basis. Ibid. Under the Act, an insurer is deemed to be in an unsafe or unsound financial condition if it is found to "have a ratio of annual net premiums written to surplus as to policyholders" that threatens its financial health. N.J.S.A. 17:33B-19d. The suspension is automatic if the insurer requests it and "avers that there is an immediate need to cease issuance of policies" and provides "supporting documentation" pertaining to its "unsafe or unsound financial condition." N.J.S.A. 17:33B-19b. Upon his own motion or upon request by the insurer or any other interested party, the Commissioner may revoke the suspension "after providing an opportunity for a hearing." N.J.S.A. 17:33B-19c; see also In re Farmers' Mut. Fire Assur., 256 N.J.Super. 607, 607 A.2d 1019 (App.Div.1992) (FAIRA requires hearing on a petition for exemption, abatement or deferral of assessments).
Apart from these provisions, the principal method of assuring the financial integrity of insurers is rate relief. FAIRA provides specifically that "automobile insurers are entitled to earn an adequate rate of return through the ratemaking process." N.J.S.A. 17:33B-2g. The courts have "reaffirmed that overarching constitutional prescription with regard to all affected carriers." In re Farmers Mut. Fire Assur. of New Jersey, 256 N.J.Super. at 611, 607 A.2d 1019. For example, in State Farm Mutual Automobile Insurance Co. v. State, 124 N.J. 32, 590 A.2d 191 (1991), our Supreme Court observed that the Legislature's overall intent in enacting FAIRA was "to make certain that any lessening of insurers' profits [because of compliance with the statutory scheme] would not preclude a constitutionally adequate rate of return." Id. at 61, 590 A.2d 191; see also In re Comm'r of Insurance, 256 N.J.Super. 158, 606 A.2d 851 (App.Div.1992) (upon a showing of a need to increase rates, Commissioner must grant increases and may not set deficit rates and rely on alternative sources of funding); In re American Reliance Ins., 251 N.J.Super. 541, 556, 598 A.2d 1219 (App.Div.1991) (under appropriate circumstances insurers may increase their rates based on FAIRA assessments). The Court stressed that the "Legislature deliberately left to the Commissioner of Insurance the determination of the precise constitutionally required rate of return, as being within the area of expertise entrusted to the Department of Insurance in its long exercise of the ratemaking function." State Farm Mutual Automobile Insurance Co. v. State, 124 N.J. at 61-62, 590 A.2d 191. While acknowledging "uncertainty about how the Act may be applied ... in individual rateincrease determinations," the Court expressed its confidence that the Commissioner would "fulfill his duty under the statute to assure that insurers receive a constitutionally fair rate of return." Id. at 62-63, 590 A.2d 191.

II.
We now examine the facts in light of this historical backdrop. As we have noted, FAIRA requires every insurer operating in New Jersey to absorb a "depopulation quota" of former JUA insureds. Robert Wallach, the Chairman and Chief Executive Officer of the Robert Plan, conceived the idea of creating an insurance pool to service and satisfy the depopulation quotas of seventeen member insurance companies. Lion Insurance Company was established to service the pool. As we understand it, Lion was to serve as the primary insurer *361 and the seventeen member insurance companies were to reinsure the policies written. In 1992, NCIC was formed as Lion's successor.
We previously described the quota system under which insurers were to absorb JUA insureds. We also noted that FAIRA requires insurers to appoint agents in urban areas. Operating as the administrator of the pool, NCIC satisfied the appointment obligations of member insurers by naming large numbers of urban-based agents. The overwhelming majority of NCIC agents were located in urban territories.
As we noted earlier, the demographics of urban areas tend to generate high loss experience in the automobile industry. One of the mysteries of this case is why the Robert Plan believed a profit could be earned by pooling JUA depopulation quotas. One answer might be that the Robert Plan, through its other subsidiaries, provided services to NCIC in return for almost thirty percent of the written premiums on NCIC risks. Gaydos suggests in its brief that the Robert Plan was able to avoid the risk of losses by earning "guaranteed profits" through the servicing of NCIC's business. Another possible answer is that the Robert Plan anticipated rate relief by the Commissioner. On at least two occasions, NCIC sought a rate increase. These applications were denied by the Commissioner. Although NCIC requested the Commissioner to reconsider the applications, this request ultimately became moot for reasons which we will describe later in this opinion.
In any event, from its inception, NCIC incurred substantial losses. Because NCIC's insureds were concentrated in urban areas where loss experiences are historically high, NCIC's rate structure was wholly inadequate, as the following chart clearly discloses:

 Year Losses Pure Loss Ratio[1]
 1992 $ 61,932,432 118.90%
 1993 $ 89,095,412 116.60%
 1994 $113,128,199 129.30%
 1995 $ 88,638,450 136.90%
 1996[2] $ 57,009,126 134.00%

We stress that NCIC never appealed from the Commissioner's denial of its applications for rate relief. Nor did it apply to the Commissioner for suspension of its "take all comers" obligation. It instead devised a strategy to curtail its devastating losses by terminating its agents. To determine which agents were to be terminated NCIC purportedly reviewed and rated the administrative practices of its entire agency force. Cynthia Bailey, an auditor employed by the Robert Plan of New Jersey, testified that agency terminations were based upon loss ratio, the location of the agent's business, the volume of the business written, and an evaluation of the performance of administrative duties such as obtaining the necessary underwriting information and assuring the completeness and accuracy of the applications submitted.
The forty agents who fared worst in NCIC's rating process were identified for termination. These agents were not necessarily those having the worst loss experiences. Nor were they all located in urban territories. On February 24, 1995, the first twenty agents were notified that their agreements were being terminated. On March 24, 1995, the remaining twenty agents were apprised of their termination. In each case, the Department of Insurance was informed of the termination. The Department requested that the terminations be held in abeyance to allow it to determine whether NCIC was undertaking a de facto withdrawal from New Jersey's private passenger automobile insurance market. NCIC agreed. Ultimately, the Department accepted and approved all *362 forty terminations.[3] The Department based its determination "in part on representations by NCIC that there [would] be additional producers appointed in underserved areas." NCIC apparently planned to appoint nine new agents in under-represented areas, but the de-pooling process ultimately disrupted that scenario.
In 1995, several member insurers decided that they no longer wished to participate as reinsurers in the pool. As part of the de-pooling process, the member companies were given essentially two options: (1) they could accept their proportionate share of the insured vehicles, and the associated agents, and directly write insurance for those vehicles and enter inter-agency agreements with those agents; or (2) they could pay NCIC to assume the risk of going forward for their proportionate share of NCIC's insured vehicles. A complex actuarial process was necessary to identify which insureds and which agents would be assigned to which pool member (or to NCIC). For that reason, NCIC stopped appointing new agents in mid-1995.
During the de-pooling negotiations, NCIC, on January 9, 1996, submitted a summary of its five-year business plan to the Department's managing actuary. The Department required NCIC to submit such a plan, in order to demonstrate how NCIC intended to operate profitably as an independent insurance provider in the State. Notably, NCIC's business plan assumed that NCIC would write approximately $30 million of annualized premiums in its first year; that this amount of annual premium would set the buyout fee for departing pool members and provide a capital surplus of $52 million that would be adequate for the projected annual premiums for NCIC; that the Department would approve requested rate increases; and, significantly, that NCIC would terminate ten agents both in 1996 and 1997, and five to seven additional agents each year thereafter.
Gary Ropiecki served as Executive Vice President of the Robert Plan and was the general manager of all of its New Jersey operations. Ropiecki additionally held office and served as a director on the boards of all Robert Plan companies, including NCIC. The record indicates that Ropiecki was the ultimate decision-maker in determining which agents were to be terminated. Ropiecki testified that agency termination was the only solution to reducing the volume of NCIC's business losses. Thus, in 1997, NCIC implemented a plan to reduce the volume of NCIC's new applications.
According to Ropiecki, neither an agent's territory nor the loss ratio of its policies was a determining factor in the decision to terminate. Ropiecki claimed that he focused instead on the agent's attitude, long term plan, efficiency in performing operations, and the quality of its staff. According to Ropiecki, his goal was to develop "core agents"those with high volume and low loss ratiowho would make "good long term partners." However, an internal memorandum prepared by Ropiecki that pertained to NCIC's financial difficulties perhaps better reveals Ropiecki's thought process. Ropiecki wrote:
The heart of the deterioration is the high concentration of business and territories where legislation and statutes cap the amount of premium an insurer can charge. As such, these territories historically are inadequately priced and produce industry wide poor results. In order to stop the significant capital drain, our business plan is to reduce our writings in capped territories and increase our writings in uncapped territories.[4] Until we improve our business *363 mix between capped territories and others, we will continue to incur significant capital drain. [Emphasis added.]
These observations proved highly prescient. As we noted, in its de-pooling plan presented to the Department, NCIC projected it would write between $29 and $32 million in new annual premiums between August 1, 1996 and August 1, 1997the first full year after the buyout was completed. Instead, after only ten months of actual experience, NCIC projected that it would write $43 million in new annual premiums for the first full year of operations after the de-pooling. On that basis, NCIC projected that it would lose $32 million in one yearapproximately sixty percent of its capital.
The sheer volume of business NCIC was being forced to write and the corresponding losses associated with the demographic profile of its policyholders meant that continued compliance with FAIRA's "take all comers" requirement would force the company into insolvency.
NCIC's financial plight required it to accelerate its plan to terminate agents. NCIC did not terminate agents with the worst loss ratios or all of its urban agents. Because all or substantially all of its agencies operated in areas associated with poor loss experience and because these agencies generated policies with high loss ratios, NCIC decided to terminate agencies with the highest volume. Although an agent's geographic territory and loss ratio were not direct factors in selecting agents for termination, these factors were indirectly determinative because the result of NCIC's policy was to terminate agencies operating in urban areas having poor loss experiences. Gaydos was one of those agents.
Gaydos filed a complaint in the Chancery Division seeking to enjoin NCIC from terminating its agency agreement. The court granted Gaydos a preliminary injunction. On application of NCIC, the court entered an order on September 24, 1997, modifying the injunction. Specifically, Gaydos was barred from submitting more than thirteen new private passenger insurance applications per week to NCIC. Gaydos subsequently amended its complaint and sought monetary damages for the loss of business resulting from its compliance with the limitation on new policy applications provided by the preliminary injunction. Gaydos further claimed that the Robert Plan defendants tortiously interfered with its contractual rights. A protracted non-jury trial ensued. The Chancery Division granted defendants' motion for an involuntary dismissal at the conclusion of Gaydos's case. In its oral opinion, the court stated that it "would not go so far as to accept as fact the defendants' claim that loss ratio or geographic area played no role in [NCIC's] decision [to terminate Gaydos]." It nevertheless concluded that the termination "was fair and reasonable" because the action taken was designed to stave off insolvency and was "not based merely upon loss ratio or geographic territory."
We remanded the matter to the Chancery Division for additional fact finding as to "whether loss ratios and geographic territory constituted a substantial motivating factor in NCIC's decision to terminate the Gaydos agency." On remand, the Chancery Division found that NCIC's purpose in terminating Gaydos was to "reduce the volume of its business in order to preserve its solvency." The court emphasized that NCIC did not discriminate against agencies having "higher loss ratios" or agencies "located in the worst loss [experience] urban areas." The court acknowledged that NCIC knew Gaydos operated in an urban area with a high loss experience and that it produced high loss ratio policies. The court reasoned, however, that NCIC was within its rights in terminating the Gaydos agency in order to reduce its volume of business losses.
*364 On April 28, 1998, after the Chancery Division rendered its decision, NCIC filed a request with the Department for voluntary liquidation. NCIC was placed under administrative supervision on June 3, 1998. On the following day, NCIC and the Department executed a consent order requiring NCIC to cease accepting applications for automobile insurance.[5]

III.
We now turn to the issues presented. We begin by observing that the Chancery Division's fact-findings are supported by substantial credible evidence present in the record. Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 484, 323 A.2d 495 (1974); State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964); Greenfield v. Dusseault, 60 N.J.Super. 436, 444, 159 A.2d 433 (App.Div.), aff'd o.b., 33 N.J. 78, 161 A.2d 475 (1960). Indeed, the material facts are not in dispute. Although other urban-based agencies produced worse loss ratio policies, Gaydos was selected for termination because it produced a higher volume of high risk policies generating greater financial losses to NCIC. As we phrased the issue at the beginning of our opinion, the question is whether FAIRA's "take all comers" requirement bars an insurance company from terminating an agency relationship because of the agent's production of a high volume of high loss ratio policies generated in an urban marketplace.
We repeat the operative language of the statutes critical to our disposition of this issue. N.J.S.A. 17:33B-15 provides:
a. On or after April 1, 1992, every insurer, either by one or more separate rating plans filed in accordance with the provisions of section 6 of P.L.1988, c. 156 [N.J.S.A. 17:29A-45] prior to March 1, 1998, or section 14 of P.L.1997, c. 150, [N.J.S.A. 17:29A-46.1] on or after March 1, 1998, or through one or more affiliated insurers, shall provide automobile insurance coverage for eligible persons.
b. No insurer shall refuse to insure, refuse to renew, or limit coverage available for automobile insurance to an eligible person who meets its underwriting rules as filed with and approved by the commissioner in accordance with the provisions of section 7 of P.L.1988, c. 156 [N.J.S.A. 17:29A-46] prior to March 1, 1998 or section 15 of P.L.1997, c. 150 [N.J.S.A. 17:29A-46.2] on or after March 1, 1998....
d. The commissioner may suspend, revoke or otherwise terminate the certificate of authority to transact automobile insurance business in this State of any insurer who violates the provisions of this section.
N.J.S.A. 17:33B-18 states:
a. A licensed insurance agent shall, as a condition of licensure:
(1) Provide each eligible person seeking automobile insurance premium quotations for the forms or types of automobile insurance coverages which are offered by all insurers represented by the agent or with which the agent places risks;
(2) Not attempt to channel an eligible person away from an insurer or insurance coverage with the purpose or effect of avoiding an agent's obligation to submit an application or an insurer's obligation to accept an eligible person; and
(3) Upon request, submit an application of the eligible person for automobile insurance to the insurer selected by the eligible person....
b. With respect to automobile insurance, an insurer shall not penalize an agent by paying less than normal commissions or normal compensation or salary because of the expected or actual experience produced by the agent's automobile insurance business or because *365 of the geographic location of automobile insurance business written by the agent.
Neither of these sections deals specifically with the subject of agency termination. Rather, the Brokers and Agents Act (N.J.S.A. 17:22-6.14a) governs generally the relationship between insurance companies and their agents. N.J.S.A. 17:22-6.14a(g) provides "[a]ll existing contracts between agents and [insurance] compan[ies] in effect in the State on the effective date of this [A]ct are subject to all of [its] provisions...." N.J.S.A. 17:22-6.14a(d) states that "[t]ermination of any such contract for any reason ... shall become effective after not less than 90 days' notice in writing given by the company to the agent and the Commissioner of Insurance." N.J.S.A. 17:22-6.14a(f) states that "the Commissioner of Insurance, on the written complaint of any person stating that there has been a violation of this [A]ct, or when he deems it necessary without a complaint, may inquire and otherwise investigate to determine whether there has been any violation of this [A]ct."
Noting FAIRA's ambiguity and the primacy of the Commissioner in implementing and administering the statutory scheme, the Chancery Division expressed its discomfort in adjudicating the issues presented. We harbor the same reservations. We have considered transferring this case to the Commissioner under the doctrine of primary jurisdiction. See, e.g., Kristiansen v. Morgan, 153 N.J. 298, 313, 708 A.2d 1173 (1998); Boss v. Rockland Elec. Co., 95 N.J. 33, 42, 468 A.2d 1055 (1983); Boldt v. Correspondence Management, 320 N.J.Super. 74, 82-83, 726 A.2d 975 (App.Div.1999); Ridgefield Park v. N.Y. & Western Ry., 318 N.J.Super. 385, 407, 724 A.2d 267 (App.Div.1999); City of Hackensack v. Winner, 162 N.J.Super. 1, 27, 392 A.2d 187 (App.Div.1978). We recognize the Commissioner's expertise, and we are sensitive to the principle that legal claims that are really regulatory issues should be referred to the agency. We nevertheless note that the Chancery Division repeatedly requested the intervention of the Commissioner, but the Department steadfastly refused to participate. We add that this litigation has been protracted. We are persuaded that the interests of justice and fairness to the parties militate in favor of a prompt disposition of the question presented. And finally, we emphasize that in the final analysis the interpretation of a statute is a judicial function, particularly where, as here, the plaintiff has sought the remedy of monetary damages.[6]
We thus choose to decide the issue. We hold that FAIRA's "take all comers" requirement is violated where an insurance company terminates an agency relationship because of the agent's production of a high volume of high loss ratio policies. Such a termination contravenes the insurer's duty to "provide automobile insurance coverage for [all] eligible persons." N.J.S.A. 17:33B-15a. So too, termination of an agency's relationship because of its poor loss experience, unrelated to administrative *366 incompetence or poor business practices, "penalizes an agent ... because of the expected or actual experience produced by the agent's automobile insurance business," and is thus violative of N.J.S.A. 17:33B-18b.
We acknowledge that the penalty prohibited by N.J.S.A. 17:33B-18b consists of "paying less than normal commissions or normal compensation or salary." The statute does not expressly prohibit an insurer from terminating an agency relationship "because of the expected or actual experience produced by the agent's automobile insurance business or because of the geographic location of automobile insurance business written by the agent." This omission is in contrast to the Michigan statutes upon which our statutory scheme is patterned. The Michigan law states specifically that an insurance agency may not be terminated "based primarily upon... [t]he actual or expected loss experience of the agent's automobile or home insurance business, related in whole or in part to the geographical location of that business." Mich. Comp. Laws Ann. § 500.1209(4)(b) (West 1980). This much conceded, termination of an agency because of its poor loss experience related to the geographical territory in which it operates violates the spirit, if not the letter, of N.J.S.A. 17:33B-18b. Termination is simply a more drastic way of depriving an agent of his "normal commissions or normal compensation or salary." Ibid.
Our conclusion is supported by the public policy underlying FAIRA's "take all comers" requirement. In light of the history of automobile insurance in New Jersey during the last two decades, and the legislative purpose or plan sought to be effected by FAIRA, this much at least is crystal clear. Implementation of the "take all comers" centerpiece of FAIRA requires that there be an effective conduit between the voluntary market and those insureds to whom the voluntary market was historically inaccessible "for an obvious panoply of demographic reasons." In re Producer Assignment Program, 261 N.J.Super. at 299, 618 A.2d 894. As to geographic areas that have traditionally been underserved, it is not reasonable to expect that dramatic changes will occur overnight. Nor is it reasonable to assume that the insurancerequiring public will suddenly find its way into a voluntary market with which it has no recent experience and which has no immediate neighborhood presence. Id. at 306, 618 A.2d 894. N.J.S.A. 17:33B-15 and N.J.S.A. 17:33B-18a were intended to remediate this problem. Equity among insurers is not the only equity that legitimately concerned the Legislature when it enacted FAIRA. The needs of the traditionally unserved and underserved public "must also be factored into the equation." In re Producer Assignment Program, 261 N.J.Super. at 307, 618 A.2d 894. It bears emphasis that insurers have strong motivation to evade their obligation to "take all comers" and to diminish, if not terminate, their presence in geographic areas that have been historically unserved or underserved. Excluding the high risks historically associated with urban areas permits insurers to avoid losses and saves them from remitting commissions due to their agents. But the Legislature has the authority under its police powers to compel insurers to cover people and risks they would rather not insure. The Legislature has exercised that power by enacting FAIRA. We do no more here than fairly enforce its provisions.
The obligations imposed by FAIRA are not all one way. Insurers are entitled to earn a reasonable rate of return on their New Jersey automobile insurance business. Sheeran v. Nationwide Mut. Ins. Co., Inc., 80 N.J. 548, 560, 404 A.2d 625 (1979). There is no right to make money on every policy written, or on every day of business. But there is a right to have the regulatory agency which exercises the rate-making function act reasonably and promptly. Rate relief is prospective only. Elizabethtown Water Co. v. New Jersey Board of Public Utilities, 107 N.J. *367 440, 452-59, 527 A.2d 354 (1987). Thus rates that were inadequate because either rate relief was not fairly given or because of a prolonged review process cannot be retroactively increased or otherwise made up. It is one thing to compel insurers to provide insurance to those they would rather not insure, but it is altogether unfair and unconstitutional to coerce insurers to take on business they do not want at inadequate rates.
NCIC never sought appellate intervention when the Department denied its requests for an increase in rates. At least from the vantage point of twenty-twenty hindsight, we would have been obliged to accelerate its appeal, had one been taken, and to compel the Department to exercise properly and fairly its overarching constitutional obligation to allow NCIC a reasonable rate of return. The simple and overriding fact is that NCIC did not choose to take that course.
Nor did it apply for a suspension of its obligation to "take all comers," as it could have under N.J.S.A. 17:33B-19. At least theoretically, NCIC could have limited its "exposures"[7] by filing an application with the Commissioner.
NCIC instead sought to implement a strategy that it candidly characterizes as "self-help." We cannot fault NCIC for seeking to stem its losses and preserve its financial solvency. However, FAIRA provides statutory and administrative remedies which could, and should, have been taken by NCIC to accomplish its legitimate business objectives. We are satisfied that the course actually chosen by NCIC termination of the Gaydos agency because of its high volume of high loss ratio policiesviolated the statute.

IV.
We thus reverse the Chancery Division's grant of defendants' motion for an involuntary dismissal and remand the matter for consideration of the remaining issues. We are told by Gaydos that, because of NCIC's financial problems, it intends to focus its efforts on its claim that the Robert Plan defendants tortiously interfered with its contractual rights. Difficult factual and legal issues are presented in that respect. See Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 752, 563 A.2d 31 (1989) (tortious interference presupposes interference by a nonparty to the contract). Other questions are presented concerning whether Gaydos may recover monetary damages that resulted from entry of the preliminary injunction and the limitation on its right to accept more than thirteen new applications per week. See Russell v. Farley, 105 U.S. 433, 437-38, 26 L.Ed. 1060, 1061-62 (1881) (a party injured by the issuance of an injunction later determined to be erroneous *368 has no action for damages in the absence of a bond). The trial judge did not reach these issues and thus, we express no view on how these or other issues should be decided.
Reversed and remanded for proceedings consistent with this opinion.
BROCHIN, J.A.D., dissenting.
The majority opinion holds that NCIC's termination of R.J. Gaydos Insurance Agency, Inc. is contrary to the implications of the "take all comers" provision of FAIRA. I agree with this conclusion. But I am unwilling to join my colleagues in their next step, interpreting FAIRA as granting the terminated agent the right to seek redress by an implied damage remedy.
The legislative scheme for the regulation of automobile insurance is complex and evolving. The Legislature has confided its supervision, in the first instance, to the Commissioner of Insurance. The court correctly describes the "take all comers" provision, N.J.S.A. 17:33B-15, as the "centerpiece" of FAIRA. This provision contains its own enforcement mechanisms:
The commissioner may suspend, revoke or otherwise terminate the certificate of authority to transact automobile insurance business in this State of any insurer who violates the provisions of this section.

[N.J.S.A. 17:33B-15(d).]
Furthermore,
If the commissioner determines that any person has violated any provision of [N.J.S.A. 17:33B-14 to 17:33B-18], he may impose a civil penalty in an amount of up to $2,000 for the first violation and up to $5,000 for the second and each subsequent violation, collectible in an action brought in the name of the commissioner pursuant to the provisions of "the penalty enforcement law," N.J.S. 2A:58-1 et seq.[8]

[N.J.S.A. 17:33B-21.]
The primary purpose of the "take all comers" provision is to assure that all eligible drivers have access to automobile liability insurance. It was not adopted to confer job protection on producers. The Department of Insurance has the responsibility for implementing the provision for access to insurance. In my view, the Department's overall supervisory powers and the specific enforcement provisions of the statute are sufficient for that task. There is no need or justification for our injecting a civil damage action into the existing administrative scheme.
I therefore respectfully dissent from the court's opinion.
NOTES
[1] "Pure loss ratio" is calculated by dividing the incurred losses paid by the premiums received. This percentage is calculated before costs of operation are considered.
[2] As we will note shortly, the pool was disbanded effective August 1, 1996, for the issuance of new policies. NCIC assumed the risk for all policies issued after that date.
[3] One of the agents terminated by NCIC in 1995 was Schumacher Associates. Schumacher purchased the Gaydos agency in 1996.
[4] At trial, Ropiecki explained the terms "capped" and "uncapped" territories. Ropiecki testified that "capped" territories were those "traditionally [found in] the urban marketplace." "Uncapped" territories were those in "non-urban" areas.
[5] Although NCIC is no longer in operation, Gaydos's claim is not moot to the extent that it seeks monetary damages against defendants.
[6] Our dissenting colleague concludes that the "take all comers" provision affords a litigant no implicit private cause of action. See In re State Com'n of Investigation, 108 N.J. 35, 41, 527 A.2d 851 (1987) (statute barring disclosure of information pertaining to a State Commission of Investigation matter does not provide a private cause of action for its violation); Ferraro v. City of Long Branch, 314 N.J.Super. 268, 288-89, 714 A.2d 945 (App. Div.), certif. denied, 157 N.J. 541, 724 A.2d 801 (1998) (no private cause of action for violation of Right to Know Law); Crusco v. Oakland Care Center, Inc., 305 N.J.Super. 605, 614-15, 702 A.2d 1363 (App.Div. 1997) (no private cause of action for violation of Ombudsman Act); Jalowiecki v. Leuc, 182 N.J.Super. 22, 29, 440 A.2d 21 (App.Div. 1981) (no private right of action for violation of standards governing sewerage disposal system). Plaintiff claims that the failure to adhere to the letter and spirit of the "take all comers" requirement constituted a violation of the covenant of good faith and fair dealing. Whether the "take all comers" provision affords a private right of action was never raised in the original trial, the briefs submitted on appeal, the remand proceedings, or in the supplemental briefs. We have no occasion to resolve the issue here.
[7] Although not applicable here, the Legislature adopted the Automobile Urban Enterprise Zone Act and correlative amendments to FAIRA designed to cure the many problems with which we are confronted here.

The Automobile Urban Enterprise Zone Act, N.J.S.A. 17:33C-1 to -5, provides that qualified insurers may appoint urban enterprise zone (UEZ) agents to represent it in an automobile insurance urban enterprise zone. N.J.S.A. 17:33C-4a. Pursuant to this Act, qualified insurers may limit the number of exposures written through a UEZ agent, and once the limit is reached, the UEZ agent must advise eligible applicants that coverage may be available from another agent. N.J.S.A. 17:33C-4b.
The "take all comers" provision in FAIRA, as amended, authorizes qualified insurers, operating pursuant to N.J.S.A. 17:33C-4, to "limit the number of exposures written through its UEZ agent or agents." N.J.S.A. 17:33B-15c.
N.J.S.A. 17:33B-18, as amended, provides that a UEZ agent contracting with a qualified insurer pursuant to N.J.S.A. 17:33C-4, will be deemed to have met the requirements of N.J.S.A. 17:33B-18, if the limitation on the number of exposures imposed by the qualified insurer on the UEZ agent prevents the UEZ agent from insuring an otherwise eligible person. N.J.S.A. 17:33B-18a(3).
These amendments apply prospectively. The acts upon which Gaydos relied in bringing its claim took place before the effective date of the amendmentsJanuary 1, 1998.
[8] The penalty enforcement law, N.J.S.A. 2A:58-1 to -9 has been superceded by N.J.S.A. 2A:58-10 to-12.