773 A.2d 1132

R.J. GAYDOS INSURANCE AGENCY, INC., T/A SCHUMACHER AS-SOCIATES, PLAINTIFF–RESPONDENT, v. NATIONAL CON-SUMER INSURANCE COMPANY, THE ROBERT PLAN CORPO-RATION, THE ROBERT PLAN OF NEW JERSEY AND LION INSURANCE COMPANY, DEFENDANTS–APPELLANTS, AND JOHN DOES 1–200, DEFENDANTS.

Argued March 27, 2001—Decided June 28, 2001.

256

*Alan E. Kraus,* argued the cause for appellants (*Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Mr. Kraus, Robert J. Schoenberg* and *R.N. Tendai Richards,* on the briefs).

*Richard A. Grodeck,* argued the cause for respondent (*Feldman Grodeck,* attorneys).

*Raymond R. Chance, III,* Deputy Attorney General, argued the cause for amicus curiae Commissioner of Banking and Insurance (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel; *Mr. Chance* and *Thalia P. Cosmos,* Deputy Attorney General on the brief).

*Thomas P. Weidner* submitted a brief on behalf of amicus curiae Insurance Council of New Jersey (*Windels, Marx, Lane & Mittendorf,* attorneys; *Mr. Weidner* and *David F. Swerdlow,* on the brief).

*Susan Stryker* submitted a brief on behalf of amici curiae American Insurance Association and National Association of Independent Insurers (*Sterns & Weinroth,* attorneys; *Ms. Stryker* and *Mitchell A. Livingston,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

This appeal involves New Jersey's Fair Automobile Insurance Reform Act (FAIRA), *N.J.S.A.* 17:33B-1 to -63, a comprehensive legislative initiative that was enacted in 1990 to reform New Jersey's automobile insurance system. The questions presented in this appeal are whether plaintiff, R.J. Gaydos Insurance Agency, Inc. (Gaydos), has an implied private right of action under FAIRA to assert a claim against defendant, National Consumer Insurance Company (NCIC), and whether Gaydos can assert a common-law cause of action for breach of the implied duty of good faith and fair dealing when that claim is based solely on allegations that NCIC violated FAIRA.

The Appellate Division did not address whether FAIRA authorizes a private right of action by an insurance agent. Rather, a divided panel of the Appellate Division held that NCIC violated FAIRA because it terminated Gaydos based on its large volume of high loss ratio policies, in violation of *N.J.S.A.* 17:33B-15 and

*N.J.S.A.* 17:33B–18b, and remanded to the Law Division to address Gaydos's tortious interference with contract and related claims. *R.J. Gaydos Ins. Agency, Inc. v. National Consumer Ins. Co.,* 331 *N.J.Super.* 458, 475, 478, 752 *A.*2d 356 (2000). NCIC appeals to this Court as of right. *R.* 2:2–1(a)(2).

## I

For decades the New Jersey Legislature has attempted to reform the State's automobile insurance system to provide coverage to high-risk drivers. Prior to 1983, those drivers who had been unable to procure insurance coverage in the voluntary market received coverage through an Assigned Risk Plan, *N.J.S.A.* 17:29D–1, pursuant to which the Commissioner apportioned high-risk drivers among all insurers doing business in New Jersey. Thereafter, in 1983 the Legislature adopted the New Jersey Automobile Full Insurance Availability Act, *N.J.S.A.* 17:30E–1 to –24, to replace the assigned risk system. That Act contemplated that motorists who were rejected by the voluntary market would receive coverage at standard market rates through the statutorily-created Joint Underwriting Association (JUA). When the JUA was operational, insurers could apply to become servicing carriers for the JUA and bear administrative responsibility for collecting premiums and arranging coverage. However, the agreements between the JUA and servicing carriers provided that the claims and liabilities of the JUA would be borne by the JUA independently, and the servicing carriers were to be insulated from such claims and liabilities. The primary objective of the JUA and the Act was "to create a more extensive system of allocating high-risk drivers to carriers, and through the JUA, to provide such drivers with coverage at rates equivalent to those charged in the voluntary market." *State Farm Mut. Auto. Ins. Co. v. State,* 124 *N.J.* 32, 41, 590 *A.*2d 191 (1991). We set forth the embattled history of the JUA in *State Farm, supra,* and we need not reiterate those facts here. *See In re Commissioner of Insurance's March 24, 1992 Order,* 132 *N.J.* 209, 212–13, 624 *A.*2d 565 (1993) (describing

how JUA was more complex than Assigned Risk Plan). We note only that by 1990 the JUA had accumulated a financial deficit of over $3.3 billion in unpaid claims and other losses, and that the JUA was insuring over fifty percent of New Jersey's drivers. *State Farm, supra,* 124 *N.J.* at 42, 590 *A.*2d 191.

To repay the JUA's debt and replace the JUA system with a workable distribution of the automobile insurance market, the Legislature in 1990 enacted FAIRA to dismantle the JUA and return its automobile insurance business to the private marketplace. Because a primary objective of FAIRA was to transfer JUA insureds to private insurance companies, FAIRA required every insurer operating in New Jersey to absorb a certain quota of JUA policyholders in proportion to the size of their existing book of business or, in the alternative, to appoint agents in urban territories. Under FAIRA, the individual insurance companies were permitted to decide the manner and method by which they serviced their depopulation quotas.

In 1989, Robert Wallach, Chief Executive Officer of the Robert Plan Corporation (RPC), devised a plan to help insurance companies comply with that mandate. RPC enlisted seventeen independent insurance companies conducting business in New Jersey to form a pool, designated the New Jersey Voluntary Private Passenger Automobile Insurance Pool (Pool). NCIC was then created to write insurance policies for the Pool and act as the primary insurer of those policies, and the members of the Pool were required to reinsure those policies. RPC, as NCIC's holding company and ultimate parent, administered the Pool by providing underwriting, data processing, and claims handling services. By participating in the Pool, the insurance companies were told that the Department of Banking and Insurance (DOBI or Department) would give them credit for "1) their ... [share] of the Fair Act depopulation quotas for their percentage of the Pool; 2) the demographic/geographic distribution of brokers and insureds involved/insured within the policy base; 3) a flow through of any Assigned Risk credits generated by [NCIC's] class/territorial writ-

ings; 4) credits applicable against their ... obligations to contract with eligible producers whose sole or primary market is the JUA/MTF; and 5) any profits or losses generated by the Pool."

From its inception, NCIC incurred substantial losses. NCIC's "pure loss ratio," the percentage derived by dividing incurred losses, exclusive of operating costs, by premiums received, was over 100%. The following chart demonstrates those losses:

| Year | Losses | Pure Loss Ratio |
|------|--------|-----------------|
| 1992 | $61,932,432 | 118.90% |
| 1993 | $89,095,412 | 116.60% |
| 1994 | $113,128,199 | 129.30% |
| 1995 | $88,638,450 | 136.90% |
| 1996 | $57,009,126 | 134.00% |

By 1995, NCIC determined that for it to remain solvent the company needed to slow its volume of new business. To accomplish that goal, NCIC decided to terminate forty agents. The first twenty agents were scheduled to be terminated in May 1995, and an additional twenty agents were scheduled to be terminated in June 1995. Schumacher Associates was among those agents slated for termination. That agency was owned by Edward Schumacher who acquired the Gaydos agency in 1996. Schumacher did not institute a lawsuit or make any claim as a result of the termination that took effect on May 29, 1995.

Those agents slated for termination in 1995 did not have the worst loss ratios nor were they all located in urban territories. An auditor employed by the Robert Plan of New Jersey, a subsidiary of the RPC, testified that those terminations were based on a number of factors including an agent's loss ratio, an agent's performance of administrative duties, an agent's volume of business written, and the geographic location of an agent's business.

NCIC informed DOBI of its agent termination plans, and the Department requested that NCIC forego any terminations until

the Department conducted an investigation to determine whether that action constituted a *de facto* withdrawal from the private passenger automobile insurance market, in violation of *N.J.A.C.* 11:2–29. NCIC cooperated with the DOBI and did not terminate any agents until the Department's investigation was complete. In the interim, NCIC met with DOBI officials and assured them that the company was not withdrawing from the State and that it intended to appoint additional agents in under-served areas. In May 1995, DOBI approved NCIC's terminations and stated that it did not "consider the termination of these producers as activity constituting a de facto withdrawal. This determination is based in part on representations by NCIC that there will be additional producers appointed in under-served areas."

In 1995, several insurance companies decided to leave the Pool. Responding to that development, NCIC devised a plan for "de-pooling" and moving forward as an independent insurance company. As part of the depooling process, NCIC gave departing Pool members two options. They either could accept their proportionate share of agents and insureds and write insurance policies for them directly, or they could pay NCIC to assume the risk of going forward as a stand-alone company with that member's proportionate share of insureds.

Prior to authorizing NCIC's depooling plan, however, DOBI required NCIC to submit a five-year business plan to explain how NCIC would function as a stand-alone company with a disproportionate share of urban-based insurance policies and agents. In January 1996, NCIC submitted to DOBI a six-page business plan summarizing how NCIC would reduce and stabilize its losses, and discussing how NCIC intended to operate as a profitable company. Among its list of proposed solutions, NCIC stated that it would not renew two percent of its policies each year, and not renew two existing policies for every new policy issued. In addition, NCIC would improve its claims handling procedures, and "would expect NCIC to be granted rate increases to the extent justified by these rate filings." Most significant to this appeal was NCIC's assump-

tion that "[w]e expect termination of approximately 10 agents in 1996 and 1997, and 5–7 in each subsequent year with a corresponding reduction in new lines. The agent terminations are expected to result from the agents['] failure to comply with their agency agreements usually evidenced by lack of cooperation and poor quality service." [1] Overall, NCIC's business plan evidenced the company's belief that it had the potential to survive as an independent insurance company. For example, NCIC projected that, in its first year of operation, the company would write approximately $30 million in annualized premiums and that those policies would generate a capital surplus of $52 million. Effective August 1996, the DOBI approved NCIC's business plan and entered an order allowing NCIC to operate as an independent insurance company.

In less than one year as a stand-alone company, NCIC lost approximately sixty percent of its capital. NCIC attributed its losses to its agents writing a voluminous number of policies that exceeded NCIC's projections by approximately ten million dollars. According to NCIC, the company's dire financial situation required NCIC to implement its business plan to terminate ten agents in 1997. NCIC explained that the purpose of those terminations was to reduce NCIC's volume of new applications and to slow the company's losses. To select which agents to terminate, NCIC officials testified that the company considered whether the agents were likely to search out profitable business and be actively engaged in marketing, rather than just "taking all comers." Although NCIC acknowledged that it considered an agent's volume of applications, NCIC claimed that an agent's geographical area and loss ratio were not material factors in selecting agents for termination. However, a February 1997 memorandum written by Kenneth R. Corsun, Senior Vice President of NCIC, did not

---

[1] NCIC terminated four agents in 1996. Although the record also indicates that NCIC terminated an additional 132 agents between 1995 and 1996, those agents were reabsorbed by the insurance companies who left the Pool.

support that assertion. Corsun's memorandum reads in part as follows:

> I believe the significant factors driving our results (and influencing the profiles) are the nature of the population and the conditions in the urban areas *where we are disproportionately represented.* People are poor, there are many new, inexperienced drivers, there is congestion—cars hit each other more frequently—there is much crime—thefts and vandalism—and often rampant fraud. An accident is frequently viewed as a means of "getting even" with the system or the insurance company. The nature of the PIP coverage, in particular, drives many basically honest people to take advantage of the system.
>
> Although we take steps to combat fraud ... it may not be possible to move the loss ratio to profitability without more dramatic action. *I believe our book needs to be balanced by writing heavily in non-urban areas, while trimming our writings in the urban areas.* The trimming will be done by reducing our agency plant to the designated core agents. The move to more suburban areas will be done by selectively appointing professional, profitable agents in solidly middle class parts of the state. *We can stay in the inner cities, but the book must be balanced.* We cannot make a profit being predominantly in the urban areas.
>
> [ (Emphasis added).]

In an April 1997 memorandum, Gary Ropiecki, Executive Vice President of RPC, echoed Corsun's concerns about "slow[ing] the volume of new writings in the territories in which we have significant penetration." To explain why NCIC was experiencing a deterioration in its underwriting performance and projecting a fifty percent reduction in its statutory surplus, Ropiecki observed:

> The heart of the deterioration is the high concentration of business in territories where legislation and statutes cap the amount of premium an insurer can charge. As such, these territories historically are inadequately priced and produce industry wide poor results. *In order to stop this significant capital drain, our business plan is to reduce our writings in capped territories[2] and increase our writings in territories in uncapped territories.* Until we improve our business mix between capped territories and others we will continue to incur a significant capital drain. Not taking immediate action will result in an unsafe and unsound financial course which can potentially only be cured with draconian regulatory measures.
>
> [ (Emphasis added).]

On April 16, 1997, NCIC sent a notice of termination to Edward Schumacher, the owner of the Gaydos agency. Gaydos serviced territories in Clifton, Passaic, and Paterson and had been an

---

[2] Ropiecki testified that by "capped territories," he was referring to "the urban marketplace."

NCIC agent since June 1996. NCIC stated in its brief supporting its petition for certification that Gaydos was selected for termination "[d]ue to its 600% increase in volume of new applications for insurance." NCIC explained that its termination of Gaydos was in accordance with NCIC's 1995 five-year business plan and Gaydos's agency agreement that said that either Gaydos or NCIC could terminate the agency agreement within ninety days upon written notice. On receiving the notice of termination, Schumacher did not file a complaint with the DOBI.

At trial, Ropiecki explained that Gaydos was terminated because its "overall profile" was "poor" and NCIC wanted agents that were selling "more profitable business." Similarly, Ropiecki testified that NCIC wanted agents who were "positive, who knew their insureds, who knew their marketplace." Ropiecki also conceded that Gaydos's "rapid increase in new business" was a principal reason for its termination. For example, in June 1996, Gaydos wrote seventy policies, and by April 1997, Gaydos had written 490 policies, a 600% increase. Consequently, by 1997 Gaydos's loss ratio was 131%. When Ropiecki was asked at trial whether Gaydos's increase in new policies was a "significant factor" in NCIC's decision to terminate Gaydos, Ropiecki answered that its volume was "a" factor.

NCIC contends that the events that occurred in the months following its termination of Gaydos demonstrate persuasively the reasonableness of that action. In August 1997, only one year after the DOBI approved NCIC's five-year business plan, NCIC wrote to the DOBI to request a suspension of its obligations to "take all comers," pursuant to *N.J.S.A.* 17:33B–19, a provision of FAIRA that prohibits insurers from denying or limiting coverage to otherwise eligible insureds. NCIC claimed that it needed relief because the company was in an unsafe and unsound financial condition as a result of an unexpected increase in its level of premium writings above what was projected, and an increase in its losses. NCIC said that the company was on the verge of insolvency because its five-year business plan depended on faulty assump-

tions and expectations. For example, NCIC explained that it projected that in the first year after depooling, NCIC would generate approximately $34 million in written premiums. However, NCIC's written premiums that year totaled approximately $40 million, $6 million more than NCIC projected. To remain financially solvent, NCIC stated that it requested a ten percent rate increase from the DOBI, but that "never materialized." NCIC concluded that it needed relief because the "absence of rate relief . . . and the severe limitation on nonrenewals add to the financial surplus strain and high loss trends." In addition, NCIC argued that relief was warranted because its losses were increasing and eroding the company's premium-to-surplus ratio. NCIC explained that if NCIC continued writing business at its current rate, the company would have "only $18 million in surplus to support about $40 million in written premiums." Nevertheless, in February 1998, the DOBI denied NCIC's request for relief from the "take all comers" provision.

In March 1998, NCIC wrote to the DOBI to request a withdrawal from the State pursuant to *N.J.A.C.* 11:2–29 because "without significant relief from the Department, NCIC will be insolvent before the end of 1998." NCIC stated that "[w]e have requested alternative relief, but to date all our requests have either been denied or not acted upon." NCIC explained further that it was losing surplus at the rate of $60,000 per day. Accordingly, in June 1998, the DOBI placed NCIC under administrative supervision and, pursuant to an administrative consent order, required NCIC to cease accepting new applications for automobile insurance and to wind up its business affairs.

In June 1997, Gaydos filed a complaint in the Chancery Division against NCIC alleging a number of claims including tortious interference with contract and that NCIC breached the implied obligation of good faith and fair dealing because the company wrongfully terminated its agency agreement with Gaydos in violation of FAIRA, *N.J.S.A.* 17:33B–1 to –63. Gaydos sought an injunction against the termination because Gaydos wrote only

NCIC insurance policies and faced going out of business. The trial court granted Gaydos's motion and preliminarily enjoined NCIC from terminating Gaydos's agency agreement. The preliminary injunction was later modified to prohibit Gaydos from submitting more than thirteen new private passenger automobile insurance policies per week.

The matter proceeded to a four-day bench trial. Thereafter, the trial court granted defendants' motion for involuntary dismissal at the conclusion of Gaydos's case finding NCIC's termination to be "fair and reasonable." The Appellate Division remanded the matter to the trial court for "additional fact finding respecting whether loss ratio and geographic territory constituted a substantial motivating factor in NCIC's decision to terminate the Gaydos agency." Meanwhile, NCIC filed a request with the DOBI for voluntary liquidation and was placed under administrative supervision. In June 1998, NCIC and DOBI executed a consent order that gave NCIC the right to cease processing new automobile policies and to begin non-renewing policies.

In December 1999, the trial court issued a supplemental decision and reaffirmed its decision that NCIC was not substantially motivated by loss ratio or geographic location when it decided to terminate Gaydos. A divided panel of the Appellate Division reversed, holding that NCIC violated FAIRA because it terminated its agency relationship with Gaydos due to Gaydos's generation of a high volume of high loss ratio policies, and remanding the matter to the Law Division for trial. *R.J. Gaydos, supra,* 331 *N.J.Super.* at 475, 478, 752 *A.*2d 356. Although NCIC is no longer in operation, Gaydos's claim is not moot to the extent that it seeks monetary damages against NCIC and other defendants.

II

A

The New Jersey Legislature passed FAIRA in 1990 as a comprehensive legislative initiative to address New Jersey's trou-

bled automobile insurance system. Noting that the automobile insurance system is "complicated and interrelated," the Legislature called for "a logical, comprehensive and complete revision of various laws and regulatory schemes that impact, in whatever fashion, on the system and its participants." *N.J.S.A.* 17:33B–2f. The goals of the Act were to reduce insurance costs for the majority of New Jersey motorists, to depopulate the JUA by moving its insureds into the voluntary market, and to create a funding mechanism to pay off the JUA debt. *State Farm, supra,* 124 *N.J.* at 42, 590 *A.*2d 191; *see also In re Commissioner, supra,* 132 *N.J.* at 214, 624 *A.*2d 565 (discussing how automobile insurance reform was central issue in 1989 gubernatorial campaign). To accomplish those goals, FAIRA required insurers to absorb a quota of JUA policyholders in proportion to the size of their existing book of business or, in the alternative, to appoint agents in urban territories. The Appellate Division has explained the purpose of that mandate as follows:

> The plain fact is that urban auto owners have not had fair access to the voluntary auto insurance market in recent years. The result is that great numbers of perfectly sound drivers have been relegated to JUA coverage. Perhaps it is because insurers abandoned the inner cities for profitable suburban business, without distinguishing good urban drivers from bad.... The early assignment of urban exposures in the depopulation process serves to give good urban drivers the same access to the benefits of the voluntary market as their suburban counterparts. Those benefits include a greater choice of benefits and carriers, and, eventually, of costs.
>
> [*In re Aetna Cas. and Sur. Co.,* 248 *N.J.Super.* 367, 380, 591 *A.*2d 631 (App.Div.), *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991), *cert. denied.,* 502 *U.S.* 1121, 112 *S.Ct.* 1244, 117 *L. Ed.*2d 476 (1992).]

Although FAIRA has many components, our focus in this appeal is on *N.J.S.A.* 17:33B–15, the section that requires insurers to "take all comers," and *N.J.S.A.* 17:33B–18b, the section that prohibits insurers from reducing an agent's compensation and commissions based on the geographic location of an agent's business.

*N.J.S.A.* 17:33B–15 is known as the "take all comers" provision, and reads in part as follows:

> a. On or after April 1, 1992, every insurer ... shall provide automobile insurance coverage for eligible persons.

b. No insurer shall refuse to insure, refuse to renew, or limit coverage available for automobile insurance to an eligible person who meets its underwriting rules as filed with and approved by the commissioner....

[*N.J.S.A.* 17:33B–15.]

The implementing regulations state that the "take all comers" provision "prohibit[s] insurers, both individually and through their agents, from attempting to channel away eligible persons, with the effect of avoiding an insurer's obligations to provide private passenger automobile insurance coverage to eligible persons." *N.J.A.C.* 11:3–44.1(a). Thus, FAIRA requires insurers to accept automobile insurance applications submitted by all eligible persons who do not fall within the statutorily defined poor-risk category. Generally, an eligible person is a "good driver," someone with eight points or less, regardless of any risk factors. An insurer can refuse to provide coverage to a driver who it believes is "ineligible" as defined in *N.J.S.A.* 17:33B–13. To do so, the insurer must inform the applicant of its reasons for refusal and the applicant has the opportunity to appeal that decision to the Commissioner. *N.J.S.A.* 17:33B–16; *N.J.S.A.* 17:33B–17. If either the insurer or the person who was denied coverage disagrees with the Commissioner's disposition of the matter, either party can request that the Commissioner "hear the matter as a contested case." *N.J.S.A.* 17:33B–17b.

The Legislature recognized the financial impact that the "take all comers" mandate could have on insurers. Accordingly, the Act permits insurers to apply to the DOBI to request a suspension from its statutory obligation to insure all eligible persons. The Act states that the DOBI will grant relief to an insurer if it determines that an insurer "is in an unsafe or unsound financial condition." *N.J.S.A.* 17:33B–19a. An insurer is deemed to be in that condition if the DOBI finds that it has "a ratio of annual net premiums written to surplus as to policyholders that threatens" its financial health. *N.J.S.A.* 17:33B–19d. The insurer also can receive an accelerated suspension of its obligation to "take all comers" if the insurer "avers that there is an *immediate need* to cease issuance of policies." *N.J.S.A.* 17:33B–19b (emphasis add-

ed). If an insurer is suspended from its obligation to "take all comers," the suspension "shall continue until the commissioner, upon [her] own motion or upon request by the insurer or any other interested party, after providing opportunity for a hearing, orders its revocation." *N.J.S.A.* 17:33B–19c. According to the DOBI, an insurer who qualifies for relief from the "take all comers" provision is prohibited from writing any new private automobile insurance business while the relief order is in effect.

The second FAIRA provision relevant to this appeal is *N.J.S.A.* 17:33B–18b. That section reads in part as follows:

b. With respect to automobile insurance, an insurer shall not penalize an agent by paying less than normal commissions or normal compensation or salary because of the expected or actual experience produced by the agent's automobile insurance business or because of the geographic location of automobile insurance business written by the agent.

There is no legislative history amplifying the meaning of *N.J.S.A.* 17:33B–18b. However, the DOBI explains that "[i]n cases where the Department has reason to believe that a termination is based directly upon geographic location or loss ratio, it conducts an investigation of the termination. Should the Department conclude that the termination was improper, the Department may require the company to rescind the termination and reinstate the agent." Gaydos claims that NCIC violated that provision because NCIC terminated Gaydos due to its loss experience and geographic location, and asserts that "termination of an agency agreement is the ultimate in paying an agent 'less than normal commissions or normal compensation or salary.'"

The Legislature empowered the Commissioner to enforce FAIRA's provisions and penalize those who violate the Act. For example, if an insurer violates the "take all comers" provision, "[t]he commissioner may suspend, revoke or otherwise terminate [its] certificate of authority to transact automobile insurance business in this State." *N.J.S.A.* 17:33B–15d. The Commissioner also may impose civil penalties on an insurer who violates certain FAIRA provisions:

> If the commissioner determines that any person has violated any provision of [Sections 17:33B–14 to 17:33B–18], he may impose a civil penalty in an amount of up to $2,000 for the first violation and up to $5,000 for the second and each subsequent violation, collectible in an action brought in the name of the commissioner....
>
> [*N.J.S.A.* 17:33B–21.]

In addition to statutory penalties, the regulations state that if an insurer who violates FAIRA consents to an administrative penalty, the Department may require the insurer to pay a monetary penalty, reimburse the Department for the costs of investigation and prosecution, and provide "restitution of moneys owed any person." *N.J.A.C.* 11:17D–2.1c(iv).

## B

NCIC argues that the Appellate Division erroneously decided Gaydos's common-law breach of contract claims because FAIRA does not authorize insurance agents to institute a private cause of action against insurers who violate provisions of the Act. The Appellate Division did not address whether FAIRA authorized such a private right of action because it stated that NCIC did not raise that argument at trial, in its appellate briefs, in the remand proceedings, or in its supplemental briefs. *R.J. Gaydos, supra,* 331 *N.J.Super.* at 474 n. 6, 752 *A.*2d 356. We note, however, that NCIC did raise the private right of action issue in its initial opposition to Gaydos's motion for a preliminary injunction, and that argument was rejected by the trial court. NCIC did not raise that issue before the Appellate Division because NCIC prevailed at trial. Nevertheless, whether FAIRA provides Gaydos with a statutory private cause of action is a central issue in this case and we will address it in detail.

New Jersey courts have been reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action. In *Osback v. Lyndhurst Township,* 7 *N.J.* 371, 81 *A.*2d 721 (1951), the plaintiff, a town employee, injured a bystander in the course of his employment. When the plaintiff discovered that the municipality did not have the statutorily-required liability insurance to satisfy the injured party's claim,

the plaintiff sued the Township. The Court rejected the plaintiff's contention that one affected detrimentally by noncompliance with a statute has a cause of action for the injury or loss sustained, and stated that

> [w]e are cognizant of the individual hardship which may occasionally befall an employee as a result of the municipality's default in obeying the legislative command. The statute, however, while stating the requirement of public liability insurance in mandatory language, does not provide a remedy for those who may suffer through a failure to comply with its terms. If it had done so, the right to recover would be clear.
>
> . . . .
>
> Since no right of action by the appellant against the township existed prior to the statute, and since no such right was specifically created by it, in our opinion the complaint must fall.
>
> [*Id.* at 376, 81 A.2d 721.]

Similarly, the Court in *Strohmeyer v. Borough of Little Ferry*, 136 *N.J.L.* 485, 56 *A.*2d 885 (E.& A.1947) rejected a party's request to infer a private right of action where none was statutorily authorized. The Court stated that a police officer who was suspended pending a trial did not have a private right of action to sue for his pay during the suspension, observing that

> [h]ad the legislature also provided for recovery where a police officer was illegally suspended, the appellant's right to recovery in this case would have been clear; but since no such right has been granted we are obliged to find that the ruling ... was in all respects proper.
>
> [*Id.* at 485–86, 56 A.2d 885.]

To determine if a statute confers an implied private right of action, courts consider whether: (1) plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy. Those factors were established by the United States Supreme Court in *Cort v. Ash*, 422 *U.S.* 66, 95 *S. Ct.* 2080, 45 *L. Ed.*2d 26 (1975) and adopted by our Court in *In re State Comm'n of Investigation*, 108 *N.J.* 35, 41, 527 *A.*2d 851 (1987). Although courts give varying weight to each one of those factors, "the primary goal has almost invariably been a search for

the underlying legislative intent." *Jalowiecki v. Leuc,* 182 *N.J.Super.* 22, 30, 440 *A.*2d 21 (App.Div.1981).

The seminal case in New Jersey to consider whether a state statute confers an implied private right of action is *In re State Comm'n of Investigation, supra,* 108 *N.J.* at 35, 527 *A.*2d 851. There, the Court considered whether the plaintiffs, who were being investigated by the State Commission of Investigation (SCI), could be granted an injunction to enforce the SCI's statutorily-mandated confidentiality obligations. In a unanimous decision, the Court held that the plaintiffs had no private right of action under a statute that prohibited SCI employees from disclosing information obtained in the course of an investigation. In reaching its conclusion, the Court reviewed the statute's legislative history and found no evidence that the Legislature enacted the law to protect the targets of SCI investigations. Moreover, the Court found that the statute's legislative scheme provided mechanisms for the Attorney General to enforce the statute that "obviates the plaintiffs' need for a private cause of action." *Id.* at 44, 527 A.2d 851. Accordingly, the Court determined that the doctrine of exhaustion of remedies should be applied to prevent the circumvention of established procedures. *Ibid.* The Court stated that

[j]ust as we generally require that litigants exhaust their administrative remedies before they come to court ... so we hold that these plaintiffs must seek relief in the first instance through the designated statutory vehicle. If after the Attorney General and the SCI conclude their consideration of this matter the plaintiffs still believe that they have not obtained relief to which they are entitled, then ... they may seek judicial review.

[*Id.* at 44–45, 527 *A.*2d 851 (citations omitted).]

The Appellate Division in *Jalowiecki v. Leuc, supra,* 182 *N.J.Super.* at 24, 440 *A.*2d 21, similarly rejected a plaintiff's request for a court to infer a regulatory private cause of action. In *Jalowiecki,* the plaintiff-homebuyers claimed that the defendant-sellers violated a regulation governing the design and installation of individual sewage disposal systems, and that the violation was a proximate cause of the malfunctioning septic system that caused damage to the plaintiffs' home. After considering the *Cort*

factors, the Appellate Division concluded that the environmental regulations did not authorize an implied private right of action because "the legislative intent of the statutory schemes which the Department [of Environmental Protection] is charged with enforcing is to protect the environment for the public as a whole, not for any single person or group of people." *Id.* at 31, 440 *A.*2d 21. Furthermore, the court held that an implied private right of action was inconsistent with the legislation: "Although a private action might help to deter violations of the act, such protracted civil litigation could not possibly be as effective in promoting environmental protection as the summary proceedings available to the Department." *Id.* at 32, 440 *A.*2d 21.

New Jersey courts have generally declined to infer a private right of action in statutes where the statutory scheme contains civil penalty provisions. *Cf. Parks v. Pep Boys,* 282 *N.J.Super.* 1, 15, 659 *A.*2d 471 (App.Div.1995) (holding that violation of statute can generate civil remedy for plaintiff when Act does not provide for remedy, if legislative provision is for benefit of plaintiff's class of persons); *Bortz v. Rammel,* 151 *N.J.Super.* 312, 321, 376 *A.*2d 1261 (App.Div.), *certif. denied,* 75 *N.J.* 539, 384 *A.*2d 518 (1977) (holding that plaintiff has right of action in tort if plaintiff is member of class to be protected by standard of conduct proscribed by legislative provision). *See also Restatement (Second) of Torts* § 874A (stating that when legislative provision protects a class of persons but does not provide civil remedy for violations, "the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision," provide an injured member of the class a private right of action).

For example, in *Miller v. Zoby,* 250 *N.J.Super.* 568, 576, 595 *A.*2d 1104 (App.Div.), *certif. denied,* 127 *N.J.* 553, 606 *A.*2d 366 (1991), the Appellate Division ruled that the Legislature did not intend to confer a private cause of action in enacting the Casino Control Act (CCA). The court determined that the Legislature did not confer a private cause of action permitting players to seek

damages based on a casino's violation of the extension of credit provisions of the CCA because "[i]f the Legislature had so intended, we think that it specifically would have created the right to sue expressly in the [Casino Control] Act [and] ... not leave the matter to the happenstance of future judicial construction." *Id.* at 577, 595 *A.*2d 1104. The court added that "when [the Legislature] wanted members of the public to have access to the civil courts for violations of remedial statutes," *id.* at 576, 595 *A.*2d 1104, the Legislature has expressly conferred a private cause of action. To support that proposition, the court cited *N.J.S.A.* 56:9–12a (Antitrust Act of 1970), *N.J.S.A.* 56:8–19 (Consumer Fraud Act of 1971), *N.J.S.A.* 13:1K–13a (Environmental Cleanup Responsibility Act of 1983), *N.J.S.A.* 2A:35A–4a (Environmental Rights Act of 1974), and *N.J.S.A.* 55:13B–21 (Rooming and Boarding House Act of 1979) as examples of statutes in which the Legislature expressly provided for private causes of action. *See Campione v. Adamar of New Jersey, Inc.,* 155 *N.J.* 245, 266, 714 *A.*2d 299 (1998) (declining to imply cause of action for money damages for plaintiff because Casino Control Act contains elaborate regulatory scheme and no such cause of action existed at common law).

In the context of insurance statutes, our courts have similarly concluded that where there is no discernable legislative intent to authorize a private cause of action in a statutory scheme that already contains civil penalty provisions, the courts will not infer a private cause of action. As the Appellate Division noted in *In re Commissioner of Insurance's March 24, 1992 Order,* 256 *N.J.Super.* 158, 176–78, 606 *A.*2d 851 (App.Div.1992), *aff'd,* 132 *N.J.* 209, 624 *A.*2d 565 (1993),

[w]henever the Legislature intended to create civil penalties for violations of insurance statutes, regulations, and Department orders, it knew how to do so.... Implied remedies are unlikely to be intended by a Legislature that enacts a comprehensive legislative scheme including an integrated system of procedures for enforcement.

*[Id.* at 176, 606 *A.*2d 851.]

*See also Lemelledo v. Beneficial Management Corp.,* 150 *N.J.* 255, 264, 696 *A.*2d 546 (1997) (finding no private right of action for damages under Insurance Trade Practices Act, New Jersey Insur-

ance Producer Licensing Act, or Credit Life and Health Insurance Act, and distinguishing those statutes from Consumer Fraud Act that expressly provides consumers with a cause of action); *Pierzga v. Ohio Cas. Group of Ins. Companies*, 208 *N.J.Super.* 40, 47, 504 *A.2d* 1200 (App.Div.) (holding that no private cause of action exists under Insurance Trade Practices Act), *certif. denied*, 104 *N.J.* 399, 517 *A.2d* 402 (1986); *Retail Clerks Welfare Fund v. Continental Cas. Co.*, 71 *N.J.Super.* 221, 226, 176 *A.2d* 524 (App. Div.1961) (holding that provisions of Insurance Trade Practices Act prohibiting discriminatory and deceptive trade practices do not imply private right of action).

## C

Regardless of whether FAIRA confers an implied private right of action, Gaydos argues that it has a common-law cause of action because NCIC breached the implied common-law duty of good faith and fair dealing when it refused to "take all comers," in violation of *N.J.S.A.* 17:33B–15, and when it penalized Gaydos because of the geographic location from which its automobile insurance policies originated, in violation of *N.J.S.A.* 17:33B–18b.

As a general rule, we have recognized that every contract in New Jersey contains an implied covenant of good faith and fair dealing. *See Wilson v. Amerada Hess Corp.*, 168 *N.J.* 236, 243, 773 *A.2d* 1121, 1125 (2001); *Sons of Thunder v. Borden, Inc.*, 148 *N.J.* 396, 420, 690 *A.2d* 575 (1997); *Pickett v. Lloyd's*, 131 *N.J.* 457, 467, 621 *A.2d* 445 (1993); *Onderdonk v. Presbyterian Homes*, 85 *N.J.* 171, 182, 425 *A.2d* 1057 (1981); *Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.*, 69 *N.J.* 123, 129–30, 351 *A.2d* 349 (1976); *Association Group Life, Inc. v. Catholic War Veterans*, 61 *N.J.* 150, 153, 293 *A.2d* 382 (1972); *Palisades Properties, Inc. v. Brunetti*, 44 *N.J.* 117, 130, 207 *A.2d* 522 (1965). *See Restatement (Second) of Contracts* § 205 (stating "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement"). In some cases where the parties have reached an agreement, "the implied obligation of

good faith provides the necessary consideration" for the agreement. 2 *Corbin on Contracts* § 5.27 (1995). In addition, a court may impose such a condition on grounds of fairness and justice. "Where fairness and justice require, even though the parties to a contract have not expressed an intention in specific language, the courts may impose a constructive condition to accomplish such result when it is apparent that it is necessarily involved in the contractual relationship." *Palisades Properties, supra,* 44 *N.J.* at 130, 207 *A.*2d 522. Furthermore, "implied covenants and terms of a contract are as effective components of the agreement as those expressed." *Aronsohn v. Mandara,* 98 *N.J.* 92, 100, 484 *A.*2d 675 (1984).

■ Our Court has determined that the implied duty of good faith and fair dealing means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the full fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing." *Association Group Life, supra,* 61 *N.J.* at 153, 293 *A.*2d 382. *See 13 Williston on Contracts* § 38:15 (4th ed.2000) (stating that an implied covenant of good faith and fair dealing means that "neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). The Restatement explains further that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Restatement (Second) of Contracts* § 205, comment a (1981). See *Wilson, supra,* 168 *N.J.* at 245, 773 *A.*2d at 1126 (discussing implied covenant of good faith and fair dealing in various contexts and noting that its meaning has "been the subject of considerable analysis").

■ The implied duty of good faith and fair dealing is inherent in a contract even if a contract implicates a statute that does not confer a private right of action. In *Pickett v. Lloyd's,* 131 *N.J.* 457, 467, 621 *A.*2d 445 (1993), the Court considered whether an

insurance carrier's failure to pay collision damage benefits to an insured could be a basis of an action for damages. In deciding if an insurance carrier had a duty to exercise good faith in processing the insured's claims, the Court looked to the Insurance Trade Practices Act, *N.J.S.A.* 17:29B–1 to –14, that prohibits unfair trade practices by insurance companies. Based on its review of that statute, the Court acknowledged that it did not provide for a private cause of action or any other remedy not contained in the Act. Nonetheless, the Court concluded:

> Although the regulatory framework does not create a private cause of action, it does declare state policy and we do not think that finding a cause of action for the breach of the duty of good faith and fair dealing would conflict with that policy.
> [*Id.* at 468, 621 *A.*2d 445.]

Gaydos's common-law claim for breach of the implied duty of good faith and fair dealing is complicated by the fact that Gaydos's claim is based solely on its allegations that NCIC violated FAIRA. To address that concern, we are guided by the Court's decision in *Campione v. Adamar of New Jersey, Inc., supra,* 155 *N.J.* at 245, 714 *A.*2d 299. In *Campione,* a card-counting gambler brought an action against a casino and its employees for discrimination, breach of contract, and malicious prosecution. The plaintiff based his common-law claims on the defendants' alleged violation of the Casino Control Commission's (CCC) regulations that allow casinos to use countermeasures to discourage card counting.

As a result of the casino's countermeasures, the plaintiff filed a number of patron complaints with the CCC. However, the CCC informed the plaintiff that the CCC did not conduct hearings on individual complaints. The plaintiff sued the casino, and did not appeal the CCC's disposition of his patron complaints. *Campione* held that a court may entertain the plaintiff's claims that have a common-law basis, such as a discriminatory treatment claim. However, the Court concluded that the CCC should in the first instance determine whether the casino had violated the Act or regulations promulgated pursuant thereto. We stated:

> To the extent that the resolution of a plaintiff's claim depends on an interpretation of the Act or administrative regulations, the CCC should have the first opportunity

to provide that interpretation. A referral to the CCC should assure the resolution of the controversy consistent with the views of the entity best positioned to consider the matter. Retaining primary jurisdiction in the courts could dislocate the intricate regulatory structure governing a sensitive industry. Permitting courts and juries throughout the State to interpret statutory and administrative regulations could introduce confusion where uniformity is needed. The lack of uniform interpretations, in turn, could effect the stability of the industry.

[*Id.* at 264, 714 A.2d 299.]

## III

### A

■ In our view, FAIRA does not create a private right of action for an agent to pursue a claim that it was wrongly terminated as a result of an insurer's alleged FAIRA violations. First, we note that insurance agents are not members of the class for whose special benefit FAIRA was enacted. The legislative history is clear that the goal of FAIRA was to benefit New Jersey auto insureds, not insurance agents. From the outset, the Legislature declared that the efforts to reform New Jersey's automobile insurance industry were intended "to provide *to the motorists* of this State a comprehensive program of indemnification from the injuries and damages that may arise out of the ownership or operation of motor vehicles...." *N.J.S.A.* 17:33B–2b (emphasis added). *See* 22 *N.J.R.* 3853 (Dec. 17, 1990) (stating that purpose of FAIRA "is to assure that drivers with good driving records are able to procure automobile insurance coverage in the voluntary market"). FAIRA's provisions are consumer-oriented and focus on insuring all eligible persons. For example, if a driver is denied coverage, FAIRA requires the insurer to give the motorist either a written or oral explanation for why coverage was denied. *N.J.S.A.* 17:33B–16. If the driver disagrees with the insurer's explanation, FAIRA allows a driver to appeal the insurer's decision to the Commissioner. *N.J.S.A.* 17:33B–17. Finally, if the driver disagrees with the Commissioner's determination, the Commissioner is required to "hear the matter as a contested case." *N.J.S.A.* 17:33B–17b.

Furthermore, because the centerpiece of the FAIRA scheme is the "take all comers" provision, we believe that the Legislature's reform efforts were intended to assist drivers who were unable to procure automobile insurance through the voluntary market. See *In re Producer Assignment Program, supra,* 261 *N.J.Super.* at 299, 618 *A.*2d 894. The legislative history does not suggest that the Legislature adopted FAIRA to benefit insurance agents and insulate them from potential termination. Accordingly, we agree with Judge Brochin, the Appellate Division's dissenting member, that the primary purpose of the "take all comers" provision is to "assure that all eligible drivers have access to automobile liability insurance. It was not adopted to confer job protection on producers." *R.J. Gaydos, supra,* 331 *N.J.Super.* at 480, 752 *A.*2d 356. (Brochin, J., dissenting).

Secondly, we are not persuaded that the Legislature intended to confer a private right of action on an insurance agent to permit that agent to allege FAIRA violations against an insurer. On the contrary, FAIRA's statutory scheme vests enforcement powers exclusively in the Commissioner. For example, if an insurer violates the "take all comers" provision, "the [C]ommissioner may suspend, revoke or otherwise terminate the [insurer's] certificate of authority to transact automobile insurance business in the State." *N.J.S.A.* 17:33B–15d. Furthermore, the Commissioner can impose civil penalties on insurers who violate the "take all comers" provision or illegally reduce an agent's commissions. *N.J.S.A.* 17:33B–21. In addition, FAIRA gives the Commissioner the authority to set up comprehensive procedures for resolving complaints from drivers who feel that they have been improperly denied insurance coverage. *N.J.S.A.* 17:33B–17a to –17b.

Finally, to give insurance agents a private right of action under FAIRA is inconsistent with the underlying purpose of the Act. "[T]he insurance industry is strongly affected with a public interest, and is therefore properly subject to comprehensive regulation to protect the public welfare." *In re Aetna, supra,* 248 *N.J.Super.* at 376, 591 *A.*2d 631. It is within the Legislature's police power to

govern the insurance industry and promote what is in the public's interest. To allow insurance agents to bypass FAIRA's statutory and regulatory schemes and litigate alleged FAIRA violations in the judicial system without the DOBI's participation could undermine the State's ability to properly regulate the automobile insurance industry.

Thus, we hold that FAIRA does not confer a private right of action to Gaydos to pursue its FAIRA allegations against NCIC.

## B

However, we hold that Gaydos can assert a common-law claim that NCIC breached the implied duty of good faith and fair dealing when NCIC terminated its agency agreement with Gaydos. Although we recognize that the contract between Gaydos and NCIC allowed either party to terminate the contract with or without cause on ninety days notice in conformance with the Brokers and Agents Act, *N.J.S.A.* 17:22–6.14a(d), there nevertheless exists an implied obligation to perform in good faith even in contracts that contain express and unambiguous provisions permitting either party to terminate the contract with or without cause. *Wilson, supra,* 168 *N.J.* at 244, 773 A.2d at 1126; *Sons of Thunder, supra,* 148 *N.J.* at 421, 690 *A.*2d 575. See *United Roasters, Inc. v. Colgate–Palmolive Co.,* 649 *F.*2d 985, 990 (4th Cir.), *cert. denied,* 454 *U.S.* 1054, 102 *S.Ct.* 599, 70 *L. Ed.*2d 590 (1981) (stating that "[w]hat is wrong with [defendant's] conduct in this case is not its failure to communicate a decision to terminate ... but its cessation of performance").

In making that determination, we are influenced strongly by FAIRA's statutory and regulatory provisions that require insurers and agents to "take all comers" pursuant to *N.J.S.A.* 17:33B–15 and prohibit them from turning away eligible persons who seek automobile insurance coverage. Under that unique statutory framework, an agent has no choice but to "take all comers" even if that obligation requires them to accept applications that will generate high loss ratios. Unlike his or her suburban counter-

parts, an agent conducting business in urban territories faces a heightened dilemma because insureds in those geographic regions typically do not purchase insurance policies that are profitable. Thus, the urban agent has a Hobson's choice of either complying with FAIRA's "take all comers" mandate and risk termination, or violating FAIRA and suffering the penal consequences of that action. Likewise, we are cognizant of the fact that FAIRA's statutory scheme makes it difficult for insurers to terminate agents by merely following the statutory provisions in the Brokers and Agents Act, *N.J.S.A.* 17:22–6.14a(d), because the "take all comers" requirement prohibits insurers or their agents from turning away potential insureds regardless of whether that business is profitable. However, we are persuaded that by adopting FAIRA the Legislature intended for the DOBI to maintain a watchful eye on agent terminations. We note that *N.J.S.A.* 17:33B–18b provides that "an insurer shall not penalize an agent by paying less than normal commissions or normal compensation or salary because of the unexpected or actual experience produced by the agent's automobile insurance business or because of the geographic location of automobile insurance business written by the agent." In view of the strong legislative expression obligating agents to provide automobile insurance coverage to all eligible persons, and prohibiting diminution of their compensation because their policies prove to be unprofitable, to permit agents to be subject to termination because of their compliance with FAIRA would be contrary to the Legislature's intent.

██ Because we find that FAIRA's elaborate legislative and regulatory scheme suggests that the Legislature intended to invest the DOBI with primary authority to implement the Act and enforce its provisions against the automobile insurance industry, we believe that the DOBI should make the threshold determination concerning whether NCIC violated FAIRA when it terminated Gaydos. To hold otherwise would require our courts to interpret FAIRA's statutory provisions in a vacuum, without the benefit of the special competence of the DOBI. We are persuaded

that the DOBI is the appropriate entity to enforce FAIRA's provisions and determine how they should operate in the context of other statutory schemes regulating the automobile insurance industry.

Thus, on remand, the Law Division should transfer this matter to the DOBI for an administrative determination of whether NCIC violated FAIRA when it terminated Gaydos in 1997. Although we recognize that in its *amicus curiae* brief the DOBI asserts that NCIC did not violate FAIRA when it terminated Gaydos, we believe that the DOBI came to that conclusion by relying erroneously on events that took place years before Gaydos's termination. For example, the DOBI stated that in 1996 the Department approved NCIC's five-year business plan that contemplated agent terminations. However, that business plan did not mention Gaydos by name and stated only that "[w]e expect termination of approximately 10 agents in 1996 and 1997, and 5–7 in each subsequent year with a corresponding reduction in new lines. The agent terminations are expected to result from the agents' failure to comply with their agency agreements usually evidenced by lack of cooperation and poor quality service." Furthermore, the DOBI's contention that it approved NCIC's termination of Gaydos is based primarily on the fact that NCIC complied with the notification requirements for terminating agents pursuant to the Brokers and Agents Act, *N.J.S.A* . 17:22–6.14a, and not on a departmental finding that NCIC did not violate FAIRA.

Accordingly, we are unpersuaded that the Department conducted a complete and formal investigation of NCIC's termination of Gaydos in 1997. On the assumption that this matter will be transferred to the DOBI by the Law Division, we caution the Department not to rely on its previous findings but to consider this matter anew with the benefit of all relevant evidence. Specifically, we encourage the Department to consider the evidence in the record that indicates that Gaydos was a top performer among NCIC agents. For example, as of April 1997, Gaydos had the best

performance rating of all NCIC agents, and prior to the Gaydos termination, a memorandum stated that Gaydos "has excellent work mileage–68%" and that "other results are better than overall book." In addition, that memorandum listed Gaydos's loss ratio percentage for 1996 at 66.6%. According to an NCIC official, 66.6% is a "good loss ratio compared to [the] plan at large," and meant Gaydos was profitable. Those observations are difficult to reconcile with NCIC's 1996 business plan that stated: "[A]gent terminations are expected to result from the agents' failure to comply with their agency agreements *usually evidenced by lack of cooperation and poor quality service.*" (Emphasis added). Although NCIC likely will argue that its reasons for terminating Gaydos were consistent with that statement, we remind the DOBI that the focus of the issue on remand is on whether NCIC violated FAIRA when it terminated Gaydos and not whether NCIC had cause to terminate Gaydos.

If the DOBI determines that NCIC violated *N.J.S.A.* 17:33B–15 and *N.J.S.A.* 17:33B–18b when it terminated Gaydos, Gaydos has the option of pursuing its common-law claims in court based on breach of the implied duty of good faith and fair dealing. Alternatively, should the DOBI conclude that Gaydos's claims are without merit and that NCIC did not violate FAIRA, and assuming that that determination is sustained on appeal, Gaydos will not be entitled to prevail on its claim for breach of the implied duty of good faith and fair dealing.

IV

As modified, we affirm the judgment of the Appellate Division and remand the matter to the Law Division for further action consistent with this opinion.

*For affirmance and remandment*—Justices STEIN, COLEMAN, LONG, VERNIERO, and ZAZZALI—5.

*Opposed*—None.